## MORRIS GARBIS *v.* ROSE WEISTOCK

[No. 51, October Term, 1946.]

550

*Decided February 5, 1947.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Benjamin L. Freeny* for the appellant.

*Eldridge Hood Young,* with whom was *Jerome Robinson* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

The appeal in this case is from a decree entered by the Circuit Court of Baltimore City refusing to grant specific performance of a contract for the sale of certain leasehold properties situate in said city.

Morris Garbis (vendee) and Rose Weistock (vendor) each signed the contract under seal, which was dated the 9th day of May, 1945. By the terms thereof the vendor bargained to sell to the vendee, and the latter agreed to purchase properties known as 1240-1238-1236 West Ostend Street. Each of these properties was subject to an annual ground rent of $30.00. The price to be paid for the properties was $3,000.00, of which $200.00 was paid prior to the signing thereof; the balance of $2,800.00 to be paid in cash within sixty days from date of the contract. It provided for adjustments of taxes, ground rents, house rents, and any other public charges at the time of the settlement. It further provided: "Time is the essence of this contract." The vendee prepared the contract. He engaged J. Dallas Kirwin, an attorney, to search the titles to and redeem the ground rents on these properties.

The vendee had no communication with the vendor from May 9th until, according to his testimony, he had Abraham W. Saul, an attorney who sometimes handled real estate matters for him, to call the vendor over the telephone at her home in Washington. The vendee was present at the time Saul made the telephone call, but did not hear the conversation. The vendee and Saul said that this telephone call was made before the time limited in the contract for settlement and thought it was around July fifth. The purpose of the telephone call was to agree to a time and place to put through the settlement. The record does not show why the vendee got Saul to make this telephone call, nor why he did not make the call himself. Saul stated that the vendor told him over the tele-

phone: "She would like to postpone the settlement as she was not feeling well, that she had an old injury, and that she was anticipating going to the hospital for treatment, whether it would be agreeable to postpone this settlement for a later date, and I asked her when, and she said some time in September would be satisfactory, that she was in no hurry." The vendor denied this. She came to Baltimore every Saturday for the purpose of collecting the weekly rent from these properties. Her daughter-in-law, Mrs. Sarah Weistock, lived in Baltimore and it was the vendor's custom to go to her daughter-in-law's home on Saturdays when she came to Baltimore. The vendor was at her daughter-in-law's home on Saturday, June 30th, and requested her daughter-in-law to call the vendee on the telephone, as she wanted to know the time and place to meet him for the purpose of making settlement for these properties. She testified that she called the vendee over the 'phone from Washington on July 5th and he was not at home but she talked to his wife and told her to have the vendee call her, which he did that day. She testified she told the vendee, in this telephone conversation: " 'Mr. Garbis it looks to me very funny you don't call me or notify me where and when and what hour will take place the settlement,' so he said, 'That is all right, Mrs. Weistock,' and he gave me the address. He said, 'Saratoga No. 2 fourth floor, room 25, at Mr. Dallas Kirwin's office,' and that was the conversation with Mr. Garbis." She denied that she made any statement in this conversation about putting off the time for the settlement. She said she waited in Washington until July 12th, when she went to Atlantic City, and came back on the 26th of July.

Mrs. Sarah Weistock, the vendor's daughter-in-law, testified she called the vendee on July 2, 1945, for her mother-in-law. Her mother-in-law had asked her to get in touch with the vendee for her and to find out from him when and where the settlement was to be put through. Her evidence is: "I spoke to him (vendee) where it is to be, he told me he was trying to make arrangements to buy the ground so that when they did settle the houses

he would be able to settle the ground and the houses at the same time, and he did ask me if I thought it would be all right with my mother-in-law if they had the settlement at a later date, and I told him I would have to get in touch with her and see if it was satisfactory with her."

The vendor did not see the vendee from May 9th until the 28th of July. She said that he tried to telephone her but was not successful in reaching her over the telephone and because of this she requested her daughter-in-law to call the vendee. This was the reason for the daughter-in-law calling the vendee over the telephone on July 2nd. Vendor called the vendee when she returned from Atlantic City and he asked her to meet him in front of the Hippodrome Theatre and she did meet him there on the 28th of July. The vendee met her and his testimony as to what she said at that time is strikingly similar to the testimony of Saul as to what the vendor said to him over the telephone. The vendee stated she said: "She was also anticipating an operation from an old injury she had suffered some years back, and she did not want too much excitement on her mind, and if we would not mind it would not make any difference to her to extend the time to a later date, until about the latter part of September—any day would be satisfactory to her, because as far as she was concerned she would not lose by it, she would still be collecting the rents, and if it did not make any difference to me she would like to arrange it for that time, and I agreed with her it would be all right."

She said that when she met the vendee on July 28th, "He started to tell me I should not pay my bills because he is going to own the ground, and I should not pay the ground rent bills, and I should not make any payments for nothing because he is the owner", and she told him: "It looks funny not to pay bills."

Q. "Did you make any agreement then or any time whatever, either in writing or verbally, to put the transaction through some time later?" A. "No, sir, when he started to give me orders not to pay the bills, it was not

satisfactory at all, and when he did not make the settlement when the agreement says, I did not pay no more attention."

On July 28th she told the vendee that one house was vacant. She further said that she did not make the appointment to meet the vendee on the 28th of July, but she met him there; that Mr. Kirwin talked to her and asked her to let him know when she returned from Atlantic City, which she did, and Kirwin made the appointment for her to meet the vendee on July 28th. She said on that occasion nothing was said about the contract and that she did not change the date named in the contract for settlement. She further stated that the reason she met the vendee on July 28th was she wanted to see why they did not settle, and "why he did not go through with the settlement".

The Court asked her: "You wanted to go through with the settlement then, is that right?" (The witness) "I did not tell him nothing. When he started to tell me those things, I did not like it."

(The Court) "The only reason for seeing him was to go ahead with the settlement, wasn't it?" (The witness) "I wanted to find out why he did not make the settlement."

(The Court) "Why did you care?" (The witness) "I don't know."

(The Court) "What was the idea in your talking to him if not to set another date for the settlement?" (The witness) "Not to set another settlement?"

(The Court) "Isn't that what you intended to do?" (The witness) "It was suitable to me, the date that he made the bill of sale out, the contract."

(The Court) "But that has passed." (The witness) "That was not my fault."

(The Court) "Then why did you want to talk to him any more?" (The witness) "That is all. I promised I would see him, and I saw him."

The vendor further testified that some time in August she had the following telephone conversation with the vendee: "I told him one house was vacant. He said,

'That is what I want, the vacant house.' And I told him who I rented it to. He said, 'I want you to give them back the rent. I don't want a tenant. I don't want nothing, and don't pay no ground rents.' And I said, 'Since when are you so big a boss to give me instructions not to pay my bills.' He said, 'You will have to get yourself a lawyer,' because I did not have a lawyer before." Unless the answers of the vendor to the Court's questions can be considered as corroboration of the testimony of the vendee or of the witness Saul, there is no corroboration of their testimony.

The vendor further testified that about two hours after she talked with the vendee on July 5th over the telephone she had the following telephone call: " 'This is Mr. Dallas Kirwin speaking. I am the attorney of Mr. Garbis,' and he said to me, 'Mrs. Weistock, Mr. Garbis made a deal behind my back. I am not ready with the settlement.' " Kirwin was employed by the vendee to search the titles to these properties and also to redeem the ground rents.

On May 24, 1945, Herman J. Gerber, an attorney, wrote a letter to Mr. A. Moran, advising that his client intended to redeem the ground rents of $30.00 each on 1238 and 1240 Ostend Street, and requesting title reference to the above rents. On August 14th the vendee wrote Mrs. Norman T. Moran, in which he stated his attorney had made endless phone calls in endeavoring to contact her to arrange settlement "on the ground rents on Ostend Street" and that she had been notified "the early part of the year of our rights to redeem the ground rents and notified of our intentions" and that "for some reason best known to yourself you haven't given me the courtesy to let me know of your leaving town. This settlement has been very much prolonged." Mrs. Moran testified she received the letter of May 24th, 1945, addressed to A. Moran and she received the letter dated August 14th, which was addressed to her. She testified: "I stayed in town in Baltimore until the first of July, 1945, and I had not heard a thing from them until I was down Ocean City and received a second letter

that was forwarded to me from my home." She stated she "was a little late in getting it".

Kirwin testified that he had the title examination of the properties in question in such shape as to enable him to put the matter through on July 9th, but before that date Garbis informed him that the time for settlement had been postponed and that the titles to these properties were brought up to date some time in September. The vendee was asked if he authorized his attorney "to write to Mrs. Weistock with respect to extending the time of the contract that you had entered into with her". A. "I don't remember of him writing." He was asked: "Did you ever receive any written reply, or any written memorandum, from Mrs. Weistock, in which she agreed to extend the time of the settlement date of the contract beyond sixty days from the 9th day of May, 1945?" And his answer was: "Not that I can remember, no, sir. She did 'phone."

The appellant, in his brief, poses the question: "Will an equity court permit a person to request an extension for the performance of her contract, required to be in writing and under the Statute of Frauds, obtain that extension to a period of time beyond the date of the contract, and then, because such extension was granted by word of mouth and not reduced to writing, take advantage of such request and the granting of the same?" In written contracts which specify a given date for the consummation thereof, but do not contain a provision that time is the essence of the contract, the time limit is to be given consideration and means the approximate date within which settlement must be made. Yet if the matter is not consummated within an approximation of the time specified in the contract, in the absence of wilful conduct creating a delay, and in the absence of any injury caused by the delay, a court of equity will decree specific performance. The case of *Doering v. Fields*, 187 Md. 484, 50 A. 2d 553, discusses this question. In *Acme Building Co. v. Mitchell*, 129 Md. 406, 99 A. 545, the court decided a stipulation as to time of payment of purchase price is not ordinarily regarded as imposing a condition which re-

quires strict and punctual performance in order to entitle the vendee to have the sale consummated, and that the general rule is that time is not of the essence of such a contract, unless a contrary purpose is disclosed by the terms, or is indicated by the circumstances and object of the contract and the conduct of the parties. Neither of the contracts dealt with in those cases contained a provision that time is of the essence of the contract.

In *Soehnlein v. Pumphrey,* 183 Md. 334, at page 337, 37 A. 2d 843, at page 845, it is said: "The rule has been adopted in this State that when time is expressly declared to be of the essence of a contract of sale, a court of equity will ordinarily not grant specific performance where the purchaser has failed to make payment within the time specified by the contract. *Budacz v. Fradkin,* 146 Md. 400, 126 A. 220; *Tarses v. Miller Fruit & Produce Co.,* 155 Md. 448, 142 A. 522. But if a vendor reserves the right to forfeit the contract in the event of default in payments, but subsequently waives forfeiture for non-payment at the stipulated time, he cannot suddenly change his mind and insist upon a forfeiture without giving to the vendee a reasonable notice of his intention to that effect. *Harris v. Troup,* 8 Paige, N. Y., 423."

In *Budacz v. Fradkin, supra,* 146 Md., at page 407, 126 A. at page 222, the court said: "And so, where the terms of a contract expressly provide that it shall be completely performed and consummated by a certain date named therein, courts of equity are bound to give full force and effect to the terms thereof, unless the failure to perform by the time designated is caused by the act or default of the party against whom specific performance is asked to be decreed, whether he be vendor or vendee."

In *Bank v. Hurst's Estate,* 187 Md. 333, 50 A. 2d 133, 135, the Court said: "Parol evidence is not admissible to vary the terms of a written contract of sale of leasehold property by showing an oral agreement that the vendor would furnish the vendee a loan for the unpaid purchase price. Moreover, since such a contract is within the Statute of Frauds, it cannot be modified by a subsequent

oral agreement. *Markoff v. Kreiner*, 180 Md. 150, 154-158, 23 A. 2d 19."

As the contract in this case was within the Statute of Frauds and was required to be evidenced by a writing, likewise any change in the contract would have to be evidenced by a writing. It has been said repeatedly by this Court that oral evidence will not be received to alter, change, or vary the terms of a written contract.

The appellant relies chiefly upon the case of *Cole v. Murphy*, 144 Md. 369, 125 A. 40. In that case, 144 Md., at page 370, 125 A. at page 40, the Court said: "From the record before the Court, we are satisfied that the vendors refused, prior to the expiration of the 30-day period, to complete the transaction, and after the expiration of that period refused to extend the time or to then consummate the transfer, on grounds entirely foreign to any provision of the contract. The record fails to disclose the slightest effort on the part of the vendors to perform their obligation, nor have they ever tendered the return of the $100 paid at the time the contract was executed."

If the evidence, as contended by the appellant, shows that the appellee before the time limited in the contract refused to perform the contract, this case would be in point. If this is not so on the facts, that decision could not control the court in this case.

In *Abrams v. Eckenrode*, 136 Md. 244, 110 A. 468, the contract there dealt with stipulated that time was of the essence of the contract. The court, 136 Md. at page 247, 110 A. at page 469, said: "The object of this suit being to enforce the performance by the vendors of an agreement of sale in which the time limited for the payment of the purchase price is expressly stated to be of the essence of the contract, the purchaser is not entitled to a decree in his favor except upon proof that the original limitation of time, which he admittedly exceeded, was effectually waived or extended by the vendors or their authorized representative. *Acme Building Co. v. Mitchell*, 129 Md. 406, 99 A. 545; *Coleman v. Applegarth*, 68 Md. [21,] 28, 11 A. 284, 6 Am. St. Rep. 417. As the contract

was required by the Statute of Frauds to be in writing, an agreement modifying its provisions, such as the bill alleges, could not be proved by parol. *Walter v. [Victor G.]* Bloede Co., 94 Md. 80, 50 A. 433; *Coe's Ed., Alexander's British Statutes*, Vol. 2, pp. 737-739; 25 *R. C. L.*, p. 709. A memorandum in writing was necessary to accomplish that result. Such a memorandum would be sufficient for the purpose if signed by the agent of the vendors in pursuance of authority conferred orally. *Moore v. Taylor*, 81 Md. 644, 32 A. 320, 33 A. 886. But the extent of the change in the contract of sale must be measured by the terms of the supplemental writing, and not by any oral statement on the subject."

The chancellor must have considered all the evidence on the question of whether or not the delay was caused by the vendee and not the vendor. The only evidence in the case that could be considered to establish the contention of vendee that there was a waiver of the time limit by the vendor is the answers she made to the chancellor's questions. *Sealock v. Hackley*, 186 Md. 49, 45 A. 2d 744, 746; *Trossbach v. Trossbach*, 185 Md. 47, 42 A. 2d 905. The chancellor, while striking out certain testimony, nevertheless said, upon consideration of the whole case he would not decree specific performance of the contract in question. He did not consider the answers made to his questions by the vendor sufficient to constitute waiver of the time limited in the contract. He saw and heard the vendor testify and had an opportunity to judge her credibility. We cannot say his conclusion in this case was clearly wrong. *Sporrer v. Ady*, 150 Md. 60, 70-71, 132 A. 376; *Pattison v. Brydon*, 150 Md. 575, 584, 133 A. 328.

For the reasons given above, the decree appealed from will be affirmed.

*Decree affirmed, with costs.*