LISSAU ET UX. *v.* SMITH ET AL.

[No. 121, September Term, 1957.]

540

*Decided January 21, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*William Bruce Oswald,* with whom was *J. Purdon Wright* on the brief, for appellants.

*Gerald E. Topper* for John Warfield Smith et ux., appellees.

*Richard W. Kiefer* for Jesse J. Hurd et ux., appellees.

HAMMOND, J., delivered the opinion of the Court.

Two rival contract purchasers of the same real property at the same price are contending in this appeal for the right to consummate their purchase.

The chancellor denied specific performance to the Lissaus, the buyers whom the sellers repudiated, and sanctioned the sale to the Hurds, the buyers to whom the sellers desired to sell.

John Smith and his wife, Irma, owned in fee as tenants by the entireties the residence property known as 1210 Frederick Avenue, Catonsville. The Smiths had separated and were living apart, and the house was rented to Jesse Hurd and Glada, his wife. In April, 1956, Richard Lissau and Georgia, his wife, became interested in buying the property. Their representative visited Smith at his place of business. Smith called the Internal Revenue Department of the Federal Government to see at what figure the Government would release the house from a tax lien against him of some $44,000. As a result of the conversation, Smith named a sales price of $38,000, which was agreeable to the Lissaus. Smith arranged with the Hurds for an inspection of the house. Mrs. Hurd's mother showed them through, and afterwards Smith told the Lissaus that the Hurds were monthly tenants, at a rental of $200.00 a month, who could be dispossessed at any time, although they had paid six months' rent in advance and he would like to delay settlement as long as possible so that he could reduce the refund. On April 25, 1956, a meeting of the Smiths and the Lissaus was arranged. While waiting for Mrs. Smith to arrive, Mr. Smith filled in a standard form of contract of sale which he had brought with him, and when Mrs. Smith arrived, the con-

tract was signed by each couple. Mr. and Mrs. Smith were each given a check for $1,900 as the deposit.

The contract provided for settlement within ninety days and for time to be of the essence. It further provided that upon payment of the unpaid purchase money, the sellers would execute to the buyers a deed to the Frederick Avenue property "which shall convey the property by a good and merchantable title to the Buyer free of liens and encumbrances * * *." Mrs. Smith left, and Mr. Smith told the Lissaus that he would appreciate it if they would not rush the settlement. It was pointed out that the contract called for settlement within ninety days, to which Smith replied that the ninety days meant nothing and that the longer the buyers delayed, the better he would be pleased. He was told that the Lissaus would not need a mortgage as they had the cash available for settlement at any time. A few days after the signing of the contract, Mr. Lissau referred the matter to his lawyer for title examination. In the early part of June, Smith came to Lissau's place of business and told him that the tenants would vacate the property in July after the close of the school year—Mrs. Hurd was a school teacher—and sought assurance that there would be no earlier settlement. Lissau agreed and stated, as he had already told Smith, that he would not need the house until fall. Sometime between the 10th and 15th of July, Lissau noticed that the Hurds were still in possession and were working on the lawn and shrubbery. Since this seemed unusual for tenants who were preparing to vacate, Lissau went to Smith's place of business to see about a date for settlement. Upon being advised of the purpose of his visit, Mr. Smith refused to discuss the matter on the ground that he was too busy. A few days after this, the Lissaus sold their home, and Lissau and his brother went to Smith's office, told him of the sale of the home and asked for a settlement date. Smith refused to name one and again stated that there should be no worry about the ninety-day provision, as this would make no difference. Again, before the expiration of the ninety days, Lissau telephoned Smith at his office and was advised by the son that his father was away for an indefinite time. Four

or five days before the expiration of the ninety days, Lissau's lawyer reported that title was unmerchantable because the property was subject to Federal tax liens in excess of the purchase price, that it had been sold for non-payment of real estate taxes (the sale becoming final in November of 1956), and that the 1956 real estate taxes were unpaid. Later, he communicated the fact that he had been advised on July 24 by telephone from the Internal Revenue Service that a compromise settlement of the income tax lien against the property would take at least thirty days to consummate.

On July 31, Lissau's lawyer was told by the Hurds' lawyer that the Hurds occupied the property under a written five-year lease dated January 20, 1954, allegedly signed by both Mr. and Mrs. Smith, which contained the following language: "* * * should the landlords decide to sell the premises herein leased during the term of this agreement the tenants shall have the right to purchase the premises at a price not to exceed Fifty Thousand Dollars in fee", and that the Hurds intended to exercise their option. Thereupon, Lissau's lawyer wrote his clients a letter, restating the title defects in the property and withdrawing from the case. Lissau and his brother again went to Smith's office and showed him the letter. Smith told them not to worry, that he would have all the title defects straightened out in a few days.

A few days later, Mrs. Smith telephoned Lissau to inquire about a settlement date, and was read the letter. She was startled to learn of the written lease and immediately repudiated it, denying that she had signed it or that she had authorized anyone to do so for her. She admitted on the stand what the Lissaus testified, that she had told them in this conversation that she still wanted to go through with the contract and that she was anxious to settle, although she knew that the ninety-day period stated in the contract had expired.

On August 17, a bill of complaint for specific performance was filed by the Lissaus against the Smiths. On August 20, the Smiths entered into a written contract of sale with the Hurds, wherein they sold them the property for the same price as the Lissaus had agreed to pay. On April 4, 1957, after the answer of the Smiths to the specific per-

formance suit revealed the signing of this contract, the Lissaus made the Hurds defendants and filed a third party complaint against them so that the rights of all interested parties could be determined in one action.

Most facts were stipulated, including the fact that Mrs. Smith had not signed the lease with the Hurds but that her signature had been forged by her husband and witnessed by her son. There was no real dispute as to any material fact. Mrs. Smith testified that the first knowledge she had of the lease was in the conversation with Mr. Lissau on August 10, and that she had never authorized her husband or anybody to sign her name; that she knew her husband had rented the property, apparently on a monthly tenancy, that from time to time she had received her share of the rent, less taxes, and that she had never ratified her husband's action as to the lease. Smith did not testify. The chancellor did not purport to decide the case as a result of any determination of fact or because he believed or disbelieved one or more of the witnesses. He said: "I feel, between the two parties and the two groups, that the lessees have the more equitable claim to the property * * *."

We think the Lissaus were entitled to a decree for specific performance. It is true that where time is expressly declared to be of the essence in a sale of land, equity will not ordinarily grant specific performance if the purchaser has failed to make payment within the time specified in the contract. *Triton Realty Co. v. Frieman,* 210 Md. 252, 257, and cases cited therein. However, as pointed out in the *Triton* case, if, before time for performance, the vendor has signified his intention not to insist on timely or exact performance and the purchaser shaped his actions in reliance thereon, waiver or estoppel may preclude insistence by the vendor on the provision as to time. Judge Collins said for the Court in the *Triton* case: "To constitute a waiver by a party of a contract, such party must be estopped by his own conduct or the inequity of his position." We find that Smith is in that position here. There was evidence from which the chancellor could have found that Mrs. Smith, at the time of the signing of the contract with the Lissaus, authorized her

husband to act for her, as far as the settlement and consummation of the sale were concerned, although she denied that she had done so. She admitted, nevertheless, that she had done nothing to make the title merchantable within the ninety-day period, although she knew of the tax lien and of her contractual obligation to clear it within the stated period, saying that she assumed that the lien would be paid off at the time of settlement. She must bear with her husband the burden of having failed to do, within the stated period, what she had contracted to do. Admittedly, the Smiths did not deliver a good and merchantable title by the agreed time. We said in *Chapman v. Thomas,* 211 Md. 102, 109: "Generally, if time is of the essence, failure to perform within the stipulated time will prevent specific performance at the suit of the defaulter. * * * However, failure to perform may be legally justified and if this is the case, the mere passage of the day for settlement will not of itself prevent specific performance." This was the holding in *Budacz v. Fradkin,* 146 Md. 400, 404, 407.

The appellees argue that the Lissaus did not tender the purchase price, as they were required to do if they were to have the right to specific performance. The record leaves no doubt that the Lissaus were ready, willing, able and eager to make settlement at any time that the Smiths could offer a merchantable title and that they made repeated efforts to settle within the ninety-day period. In equity, a tender is sufficient if the purchaser is ready to, offers to, and has the ability to pay. It is true that no manifestation of readiness and ability was made directly to Mrs. Smith, but it is also true that if there had been, it would have been meaningless, because she had done nothing to see that title was good and, apparently, at no time during the ninety-day period could it have been made so. A tender would have been nugatory. Judge Parke said for the Court in *Liggett Co. v. Rose,* 152 Md. 146, 158-159, where time was of the essence in a contract to execute a lease: "The proof is clear that, if the lessees had made the tender, it would have been a useless form * * *. The decided weight of evidence is that the appellees were ready, before bringing the suit, to comply with the conditions

as was originally contemplated by the parties, and the failure of the contract to be performed within the time fixed was wholly the default of the proposed lessor, who without any just or sufficient reason notified the appellees that he would not perform the contract. Under such circumstances, the owner loses his right to treat the agreement to lease as at an end because the other parties fail to go through a nugatory ceremony. * * * On the facts of the record, as the Court finds them, the failure of the appellees to perform their contract by the time designated was caused by the indicated default of the person against whom specific performance is sought, and he cannot now set up a delay caused by his own default to defeat a proceeding rendered necessary by that default." Specific performance of the lease was decreed. Cf. *Diamond v. Shriver,* 114 Md. 643, 649.

We pass to the effect of the option to buy. The Hurds acquired no right to buy the house under the five-year lease signed by the husband alone, on which the wife's name was forged. The property was held by the entireties, and one spouse alone could not pass to a third person any interest in it or encumber it. *Columbian Carbon Co. v. Kight,* 207 Md. 203, 208 *et seq.; Marburg v. Cole,* 49 Md. 402; *McCubbin v. Stanford,* 85 Md. 378; *Tizer v. Tizer,* 162 Md. 489, 496.

The appellees urge that Mrs. Smith ratified the lease and therefore it became her valid act and created a right in the Hurds. They find ratification in the receipt of the rent from time to time and in Mrs. Smith's execution of the contract of sale with the Hurds on August 20. The record shows no more than that Mrs. Smith knew the property was rented for $200 a month and that from time to time she received her share of the rent, less deductions for taxes. It seems apparent that she was under the belief that the property was rented on a month-to-month tenancy. The law does not infer ratification from receipts of benefits unless there is a full knowledge of the facts of the transaction. *Restatement, Agency,* Sec. 99. In *Clark v. People's Bank,* 136 Md. 263, 275, it was held that the owner of land whose agent had made a lease, giving an option of purchase to the lessee, unauthor-

ized by and unknown to the owner, was not estopped by the acceptance of the rent, from denying the authority of the agent to give the option, since the rent had been accepted in ignorance of the option provision. It was noted that if the owner had accepted the rent with knowledge of the option, there would have been a different question. In the case here before us, Mrs. Smith not only did not authorize the option, but she did not know of it and her acceptance of the rent was entirely consistent with her belief that the tenancy was a monthly one.

It is likewise clear that there could be no ratification by Mrs. Smith after she had executed the contract to the Lissaus. *Restatement, Agency,* Sec. 101, states the law to be that: "Ratification is not effective: * * * (c) in diminution of the rights or other interests of persons not parties to the transaction which were acquired in the subject matter before affirmance." A pertinent comment to the quoted section says: "The rule by which ratification has the effect of authorization does not operate to destroy rights which have been created between the time of the original act and the affirmance * * *." See also 1 *Mechem, Agency* (2nd ed.), Sec. 486 at 356-357, where the author says in part: "If prior to the ratification the principal has put it out of his power to perform the contract ratified, by conveying the subject-matter thereof to a third person who took the same in good faith * * * these rights cannot be cut off at the mere volition of the principal."

There is no dispute that the Hurds knew of the existing contract to the Lissaus when they signed the contract of August 20. Since the written lease was ineffective to confer upon them any rights to purchase the property, their rights under the contract of August 20 are no greater than would be those of any other person who bought the property at that time, knowing that there was an outstanding contract. Such a person would not be a *bona fide* purchaser, and the Hurds are not. 4 *Pomeroy, Equity Jurisprudence* (5th ed.), Sec. 1405b at 1047, says that if a vendor "after making a contract, should enter into a second agreement to sell the land to B,

or should convey it to B, under such circumstances that B is *not* a *bona fide* purchaser, etc., then the prior vendee can compel a specific performance against the vendor and B." This is essentially the holding of *Engler v. Garrett,* 100 Md. 387. See also *Allers v. Klein,* 161 Md. 194; *Blondell v. Turover,* 195 Md. 251; and cf. *Thistle Mills Co. v. Bone,* 92 Md. 47, where a second buyer was a *bona fide* purchaser.

The appellees argue that since the house cannot be conveyed unless the Federal Government consents by the release of its lien, specific performance cannot be granted or enforced. This contention is made even though the Smiths admit that they intended to and can now effect a valid conveyance of title to the Hurds for the same price at which the Lissaus are entitled to buy, that is, they admit that they can clear the tax lien if the sale is to the Hurds, but say that it cannot be cleared if the court requires the sale to be to the Lissaus. We think the powers of a court of equity are not as inflexible as the Smiths hope. The record makes it plain that all of the parties have acted in the belief—and that they still so believe—that if a definite and binding contract is established at a purchase price of $38,000, the Federal Government will release its lien and that all that is required is passage of sufficient time to allow the functioning of its slow bureaucratic processes. This being so, we think the court can frame a decree which will give sufficient time for the completion of the formal mechanics necessary to effectively discharge the Federal lien and can condition the obligation of the Lissaus to pay the purchase money upon the release of the lien. If it is necessary to do so, the Smiths can be enjoined from selling the land to anyone else in the meantime. Where specific performance is proper, equity may accomplish the same result permanently or temporarily by the use of injunction. *Smith v. Myers,* 130 Md. 64.

We think that when the facts have arranged themselves in proper perspective, the case before us is one where the contract is fair, reasonable and certain and, therefore "* * * it is as much a matter of course for a court of equity to decree specific performance of it as it is for a court of law to

award damages for its breach." *The Glendale Corp. v. Crawford*, 207 Md. 148, 154.

> *Decree reversed, case remanded for further proceedings not inconsistent with this opinion; costs to be paid by John Warfield Smith and Irma Marie Smith.*