SHOREHAM DEVELOPERS, INC., ET AL. *v.*
RANDOLPH HILLS, INC.

[No. 680, September Term, 1966.]

268

*Decided December 8, 1967.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*Edward M. Statland* for the appellants.

*Samuel M. Shapiro,* with whom were *Bowen & Diggs* and *Kathryn E. Diggs* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

On June 22, 1962, Randolph Hills, Inc., by its president, Morris Perlmutter, entered into a contract with Shoreham Developers, Inc. On the same day Perlmutter Bros., Inc. also entered into a contract with Shoreham Developers, Inc. Under one of the instruments, known as the sales contract, Randolph Hills agreed to sell to Shoreham Developers a tract of land containing 32.61 acres for a total purchase price of $351,000 of which $10,000 was to be deposited with attorneys for the seller. Of particular importance to the present dispute is paragraph 5:

"On or before ninety (90) days from the date hereof or as soon thereafter as a report of title can be obtained if promptly ordered, the Purchaser and Seller

agree and shall be required to make settlement of this contract. It is understood that the time of settlement is of the essence. Settlement is to be made at the office of the Purchaser's choosing, and deposit with said firm of the deed and such other papers or cash payment as may be required by the terms hereof shall be considered good and sufficient performance of the terms. If the Purchaser shall fail or refuse to make settlement in accordance with the provisions of this contract, his deposit may be forfeited as liquidated damages or, without such forfeiture, the Seller may at its option pursue such other legal and equitable remedies for the enforcement hereof as it deems proper."

The second contract, described as the finishing contract, embodied the terms and conditions relative to the seller processing the land involved in the sales contract into finished lots. Some of the requirements in this contract were conditions precedent to settlement.

It should be understood from the beginning that Perlmutter (the testimony as to this was undisputed) requested that the original contract be separated into two agreements so as to afford Randolph Hills certain tax benefits. Theodore Lerner, vice-president of Shoreham Developers, agreed that Perlmutter could prepare the contract in any manner he wished, so long as it was one overall agreement and reflected all the terms and conditions agreed upon.

Immediately following the execution of the agreements and pursuant to their terms, the purchaser, Shoreham Developers, filed applications with the Veterans Administration and the Federal Housing Administration for approval of the homes they intended to build. In addition it entered into other preliminary agreements, such as ordering a title report, retaining engineering firms and obtaining a standby commitment for construction financing from the Prudential Insurance Company, making a $9,000 deposit for this latter commitment.

In the meantime, Randolph Hills, pursuant to its obligation under the finishing contract, received the approval of the Maryland-National Capital Park and Planning Commission for ninety

of the lots covered by the sales contract. However, as September 20, 1962, which was the ninetieth day after the execution of the agreements, drew near, it became increasingly obvious that Randolph Hills would be unable to settle. It had agreed under the finishing contract to sign certain engineering agreements relating to sewerage and water rights of way with the Washington Suburban Sanitary Commission (WSSC) "prior to settlement," but by September Randolph Hills was unable to obtain WSSC approval.

As the settlement date approached, Perlmutter informed Lerner of the difficulty it was having obtaining the WSSC commitments and suggested an extension of the time for settlement. Lerner verbally agreed to wait until Perlmutter had performed all of the preliminary conditions, and on September 18, 1962, Shoreham Developers sent a letter to Randolph Hills confirming the mutually agreed to modification. The last sentence of this letter read: "Should the aforegoing be agreeable, please sign a copy of this letter and return same to us." Although the record discloses that Randolph Hills never signed and returned a copy of the written modification, it is devoid of any indication that Randolph Hills expressly or impliedly objected to the modification as it appeared in the September 18 letter. The parties discussed going to settlement on numerous occasions between September 20, 1962 and the early part of 1963, however Perlmutter and his company remained unsuccessful in their attempt to obtain WSSC approval. Early in 1963, Perlmutter made a new proposal to Lerner; Randolph Hills would apply with the county for a zoning reclassification which would permit construction of apartment units on the same land which was the subject of the sales contract and the finishing contract. Both parties would then enter into a joint venture to develop the apartments together. Lerner agreed on behalf of Shoreham Developers but only on the condition that the parties revert to the original agreement of June 22, 1962 if the new arrangement did not go through as planned.

The final chapter to this wayward venture began with the county approval of the rezoning application on August 4, 1964. Lerner contacted Perlmutter and requested that he prepare the final documents, but Perlmutter informed him that he was un-

der no obligation to Lerner with respect to the apartments. Lerner was quite upset at this new twist, but after protesting, inquired as to whether the parties could fall back on the original deal, since there was obviously no agreement regarding the apartments. To this, Perlmutter replied that the original agreement had been "cancelled." At this final meeting between the parties Perlmutter offered Lerner $50,000 to forget about the whole thing, which offer Lerner rejected.

Shoreham Developers, Inc., and Lerner filed a bill of complaint for specific performance on August 12, 1964. On May 17, 1965, attorney for Randolph Hills sent notice to Lerner that the seller was declaring the original contract null and void and was retaining the $10,000 deposit as liquidated damages. The appellants then filed their amended bill on July 13, 1965. In this pleading, they alleged that at all times after June 22, 1962 they had been ready, willing and able to go to settlement. The case proceeded to trial and at the close of appellants-petitioners' case, the court granted appellee-respondent's motion to dismiss under Rule 535. From this dismissal, Shoreham Developers, Inc. and Lerner appealed. We reverse the decision of the lower court.

At the outset, it must be noted that the court below treated both instruments of June 22, 1962 as forming only one contract involving the sale of finished lots. We agree with this construction. Paragraph 10 of the sales contract reads:

> "The principals to this contract mutually agree
> * * *; that this contract contains the final and entire
> Agreement between the parties hereto and they shall
> not be bound by any terms, statements or representations not contained herein."

Notwithstanding the above integration clause, this Court does not find a situation requiring the application of the parol evidence rule to exclude reading the instruments together. It is quite apparent that the parties did not intend the sales contract standing by itself to be a final and complete integration of the agreed upon terms. See *Markoff v. Kreiner*, 180 Md. 150, 23 A. 2d 19 (1941). As this Court noted in *Rinaudo v. Bloom*, 209 Md. 1, 9, 120 A. 2d 184, 189 (1956), and more recently

in *Whitney, Exec. v. Halibut, Inc.,* 235 Md. 517, 528, 202 A. 2d 629, 634 (1964), even the sentence "This contract contains the final and entire Agreement between the parties," may embody a recital of facts which may be untrue. Such an integration clause is not invariably conclusive, and its coverage is a matter of interpretation. See also *Brooks v. Towson Realty, Inc.,* 223 Md. 61, 162 A. 2d 431 (1960), where the Court treated two separate but contemporaneous contracts for the sale of contiguous parcels of land as comprising only one overall contract for the sale of both parcels. It is interesting to note that in *Towson,* as in the instant case, one of the reasons for separating the agreement into two contracts was to enable one of the parties to derive a tax advantage through such procedure.

The lower court, viewing the agreements as one contract involving the sale of finished lots, stated:

> "The Court finds at this stage of the case that the plaintiff has failed to make out a case in his favor of specific performance. In other words, he must himself, as a prerequisite, comply with all the requirements which he has agreed to comply with. Namely, it is up to him to make a date for settlement, to appear at the settlement, to deposit the money and then if the defendant fails to convey the property, if he fails to comply with all the prerequisites that he has agreed to then he would be in default and the specific performance would lie.
>
> * * *
>
> "The Court is not passing upon whether or not laches exist but the Court is passing upon the question of whether or not the plaintiff has complied with the terms of the contract in that he has not made a date for settlement, he has not put the defendant in default."

The lower court was also of the opinion that, although the parties may have waived the time limit for settlement originally set by the terms of the contract, time continued to be of the essence of the contract and therefore it was incumbent upon Shoreham Developers thereafter to set a definite time for settlement which it failed to do. It appeared to the Chancellor that

"the parties were just dragging their feet, so to speak, in connection with this entire contract."

In disagreeing with the lower court we are persuaded by the fact that the record reveals uncontradicted evidence that the appellants were ready, willing and able to perform on September 20, 1962, the date originally set for settlement within the purview of the contract terms. Furthermore, it is clear from the record that it was the appellee's failure to perform the conditions precedent, in the nature of securing the rights-of-way for water and sewer service in compliance with the requirements of the WSSC, and the rights-of-way for sanitary sewers and storm sewers, as provided by paragraphs 8 and 10 of the finishing contract, which made it impossible to settle, not only on September 20, 1962, but for many weeks thereafter. The untenability of the appellee's position is emphasized by the fact that the rights-of-way or easements for water and sewers were never obtained by the appellee.

On September 18, 1962, Shoreham Developers after learning from Randolph Hills that it was encountering difficulty in obtaining approval from WSSC, wrote Randolph Hills as follows :

"Please let this letter serve to confirm our understanding that settlement on our contract dated June 22, 1962, to purchase 32.61 acres of ground from your corporation, is hereby continued until such time as all sewer, water and storm sewer plans have been approved by the Washington Suburban Sanitary Commission and the necessary governmental authorities of Montgomery County, Maryland.

"All provisions of our agreement dated June 22, 1962, shall remain in full force and effect unchanged and unimpaired, except for the date of settlement as aforesaid.

"Should the aforegoing be agreeable, please sign a copy of this letter and return the same to us."

Since Randloph Hills did not acknowledge receipt or return a signed copy, the objection is raised that it cannot be enforced against the appellee since this involves the modification of a

contract for the sale of an interest in land, which falls within the statute of frauds requirement of signature by the party against whom it is to be enforced. See *Garbis v. Weistock,* 187 Md. 549, 556, 51 A. 2d 154, 157 (1947). If we assume, without conceding, that the mutual extension of the original settlement date amounts to modification of the land sales contract, and that such a modification must itself comply with the formalities of the statute of frauds, we are of the opinion that the agreement may still be set up to estop the appellee from using it defensively so as to impose a forfeiture of the appellants' deposit.

Professor Corbin states:

"Where time is of the essence, meaning that performance on time is a condition of the other party's duty, this condition can be waived by a mere expression of willingness by that other party; an 'extension of time' is such a waiver." 3A Corbin, *Contracts* § 722 (1960).

In a footnote to the above-quoted statement, Corbin continues:

"Where time of payment is expressly of the essence, the condition may readily be held to be waived or eliminated if the vendor makes payment on time difficult or if he is himself not ready to convey. Zempel v. Hughes, 85 N. E. 641, 235 Ill. 424 (1908).
"The 'waiver' does not have to be in writing, even though the contract is within the statute of frauds and is in writing. * * *. An oral agreement fixing a new date for performance would not be enforceable as a contract; but it may nevertheless prevent the vendor from defending on the ground that payment was not on time. The discussion in Garbis v. Weistock, 51 A. 2d 154, 187 Md. 549 (1947), is somewhat confused; but the decision is sustainable if the trial court found that the defendant had never in fact 'waived' the condition." *Ibid.*

It is abundantly clear that, by waiving the 90-day settlement period in this case, appellee is estopped from relying on any alleged formal deficiency of the modification to impose a for-

feiture of the deposit. *Cf. Griffith v. Scheungrab,* 219 Md. 27, 146 A. 2d 864 (1959).

Furthermore, the Court notes that, aside fom the waiver which was established by oral agreement and the letter between the parties, the failure of the appellee to fully perform a condition precedent to settlement before September 20 also prevents it from demanding strict compliance by Shoreham and Lerner.

In discussing oral variations to contracts within the statute of frauds, Professor Corbin states:

> "Where 'time was of the essence'—that is, where performance by the plaintiff within a specified time was a condition precedent to the defendant's duty to perform his part—if the plaintiff has been caused to delay his performance beyond the specified time by the request or agreement or other conduct of the defendant, the plaintiff can enforce the contract in spite of his delay. This assumes that the non-performance of the condition was not caused by the plaintiff's own inability to perform, and that but for the defendant's request, agreement, or other conduct, the plaintiff would have performed the condition. If the defendant later repudiates or otherwise breaks the contract, he cannot use the plaintiff's failure to perform on time as a defense." (Citing *Walter v. Victor G. Bloede Co.,* 94 Md. 80, 50 A. 433 (1901).) 2 Corbin, *Contracts* § 310, p. 112 (1950).

It appears that the appellee's failure to perform the condition prior to the settlement date, and their oral waiver of the 90-day provision, induced and shaped the appellants' action in reliance thereon, and they are now estopped to insist on strict compliance of the settlement provisions as to time. See *Silver Holding Corp. v. Sheeler,* 231 Md. 35, 37, 188 A. 2d 562 (1963); *Lissau v. Smith,* 215 Md. 538, 138 A. 2d 381 (1958).

The appellee argues that since time was made of the essence by express provision in the sales contract, the appellants breached the agreement by making no effort to provide for a settlement date. However, we are of the opinion that both the agreement extending the 90-day settlement period and the dila-

tory conduct of the appellee, which amounted to a waiver of the original settlement date, had the further effect of waiving the requirement that time was of the essence, and established a requirement that settlement merely be within a reasonable time.

> " 'Where time of performance is of the essence of the contract, a party who does any act inconsistent with the supposition that he continues to hold the other party to his part of the agreement will be taken to have waived it altogether. When a specific time is fixed for the performance of a contract and is of the essence of the contract and it is not performed by that time, but the parties proceed with the performance of it after that time, the right to suddenly insist upon a forfeiture for failure to perform within the specified time will be deemed to have been waived and the time for performance will be deemed to have been extended for a reasonable time.' " 6 Williston, *Contracts* § 856, p. 232 (3d ed. 1962) (quoting from *Globe Brewing Co. v. American Malting Co.,* 152 Ill. App. 194 (1909) ).

We do not think that Shoreham Developers was in default for not having reset a definite date for settlement after the September 20, 1962 date had passed. Nor do we think that it was necessary for Shoreham Developers to do this in order to put Randolph Hills in default. The evidence reveals that Shoreham Developers, through Lerner, was keeping in touch with the progress or lack of progress being made and knew that Randolph Hills and Perlmutter had not performed the required conditions precedent.

In contracts, containing conditions precedent, it is axiomatic that a promisor's duty does not arise until the conditions precedent have occurred or been performed. *Barnes v. Euster,* 240 Md. 603, 214 A. 2d 807 (1965) ; *K & G Construction Co. v. Harris,* 223 Md. 305, 164 A. 2d 451 (1960) ; *Griffith v. Scheungrab,* 219 Md. 27, 146 A. 2d 864 (1958) ; *Royal McBee Corporation v. Bryant,* 217 A. 2d 603 (D. C. App. 1966). In *Scheungrab,* Judge Hammond (now Chief Judge), speaking for the Court, said :

"Where a contractual duty is subject to a condition precedent, whether express or implied, there is no duty of performance and there can be no breach by non-performance until the condition precedent is either performed or excused." 219 Md. at 34, 146 A. 2d at 868.

The above quoted language was repeated by Judge Hammond in *Euster*.

Lerner testified on behalf of the appellants, and this testimony was undisputed, the Chancellor dismissing the case at the conclusion of the appellants' testimony, that on numerous occasions after September 20, 1962, he met with Perlmutter of Randolph Hills endeavoring to obtain a settlement date. It is true that when the project seemed to be running into obstacles, the parties discussed the possibility of entering into a joint venture to construct apartment units on the tract. However, Lerner's uncontradicted testimony was that neither of the parties intended the original contract to be abrogated unless or until the joint venture materialized.

Randolph Hills did not repudiate the contract until the parties met shortly after favorable rezoning of the property had been approved on August 4, 1964. Until that time we find no evidence in the record that Shoreham Developers had been in default. On the contrary, it would appear that it and Lerner had been reasonably diligent to comply with their contractual rights and obligations.

Certainly, after the repudiation of the contract by the appellee, the appellants, in order to place the appellee in default, were not required to serve notice on the appellee of some future definite settlement date and go through a hollow ritual of tender. Neither law nor equity requires a person to perform a useless act. This Court in *Darneille v. Geraci,* 237 Md. 51, 205 A. 2d 55 (1964), a case involving specific performance of a real estate contract, speaking through Judge Horney, said:

"When, as here, it became clear that the sellers * * * had no intention of going through with the sale in any event if that could be avoided, the purchaser was thereby required either to accept the title as it was

278

and tender payment into court or take the risk of possibly losing his suit for specific performance. *Chapman v. Thomas*, 211 Md. 102, 126 A. 2d 579 (1956). * * *. When, however, a purchaser is at all times able, ready and willing to perform, a tender before trial is not necessary where the seller has expressed his intention not to perform. See *Christian v. Johnson Construction Co.*, 161 Md. 87, 155 Atl. 181 (1931), where it was held that a tender is not necessary when it would have been futile. See also *Lissau v. Smith*, 215 Md. 538, 138 A. 2d 381 (1958); *Maughlin v. Perry*, 35 Md. 352 (1872); Pomeroy, *Specific Performance of Contracts* (3rd ed.), § 361. As to a tender being unnecessary if a seller repudiates a contract before suit or where it appears he would refuse a tender, see 49 Am. Jur., *op. cit.*, § 144." 237 Md. at 56, 57, 205 A. 2d at 58.

The principle that equity does not insist on a purposeless act was again affirmed by this Court in *Finkelstein v. Miller*, 239 Md. 512, 211 A. 2d 833 (1965). See also *Livingston v. Green Prop. Inc.*, 222 Md. 354, 357, 160 A. 2d 594, 595 (1960); *Jaeger v. Shea*, 130 Md. 1, 7, 99 A. 954 (1917). To the same effect, see 6 Williston, *Contracts* § 834 (3rd ed., 1962).

It must be borne in mind that the Chancellor dismissed the bill of complaint at the close of the appellants' case pursuant to Maryland Rule 535, and under such circumstances the testimony and evidence adduced by the appellants stand undisputed and they are entitled to every favorable inference which may reasonably be drawn from their testimony and exhibits. We think the Chancellor was in error in dismissing the case, and accordingly we reverse the order granting the motion to dismiss and remand the matter for further proceedings.

*Order reversed and case remanded,*
*appellee to pay the costs.*