## BROOKS ET UX. *v.* TOWSON REALTY, INC.

[No. 208, September Term, 1959.]

62

*Decided June 30, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Charles C. Hartman, Jr.,* with whom was *C. Edward Hartman, II,* on the brief, for appellants.

*Sidney Blum,* for appellee.

64

HAMMOND, J., delivered the opinion of the Court.

As part of one transaction Scott Brooks and his wife executed two documents, identical except for the property described and its price, whereby they agreed to sell to Towson Realty, Inc., three contiguous parcels of land—Parcel A (land fronting on Dulaney Valley Road) for which the stated price was $75,000, and Parcel B (back land) for which the purchase price was stated to be $3,000.[1] The appeal is from a decree which declared that the two documents are two separate and distinct contracts and that Towson Realty had exercised an option granted by the contracts to cancel as to Parcel A, and which ordered the Brooks to convey Parcel B to Towson Realty.[2]

The Brooks' basic contention is that there was but one contract to sell the land for $78,000, divided into two parts solely at the request and for the convenience of Towson, and that there can be no conveyance required as to Parcel B unless Parcel A is settled for also. Towson Realty contends that there were two distinct contracts, which entitled it to consummate one and to defer or reject settlement for the other.

In 1957 the Brooks acquired some ten acres, part of a larger tract located between the Dulaney Valley Road and the York Road, in Baltimore County. This acquisition adjoins four acres, formerly part of the same tract, conveyed to Tow-

---

1. Towson Realty, by a third identical contract, bought a third contiguous lot, Parcel C, from Prospect Hill Cemetery, Inc., a corporation owned wholly by the Brooks. The chancellor decreed specific performance as to this lot. Prospect Hill did not appeal and has conveyed the lot, so it is not involved here.

2. In his memorandum of June 26, 1959, Judge Raine says: "The Respondent's demurrer specifically raised the question of Complainants' right to declaratory relief, and it seems that this petition should have been filed in a law court, *Glorius v. Watkins*, 203 Md. 546, but counsel for both parties, in conference with the Court, have requested a decision and the Court considers such a request as amounting to a waiver of the objection to equity jurisdiction. See *Moore v. McAllister*, 216 Md. 497." Judge Raine advised counsel that Towson would have to elect to either disaffirm as to Parcel B or to move for specific performance, and Towson chose the latter course.

son Realty in April 1958. These latter four acres, on which Towson Realty has erected two stores now leased to Taubman's and the Great Atlantic & Pacific Tea Company, were the subject of the litigation reported in *Hill v. Towson Realty, Inc.,* 221 Md. 389, in which this Court on February 11, 1960, decided that certain language in an 1890 deed did not restrict the land involved to cemetery use.

The Brooks formed Prospect Hill Cemetery, Inc., and conveyed to it 6½ acres of the land they bought, retaining individually some 3.9 acres, adjacent on the west and south to the 4 acres Towson Realty previously acquired out of the same tract.

By the two separate documents, each dated June 7, 1958, and executed at the same time, the Brooks agreed to sell to Towson 1½ acres of the land they retained. Parcel A, the subject matter of one of the contracts, fronting 133 feet on the Dulaney Valley Road with an irregular depth of some 125 feet, contained approximately 15,500 square feet, and was sold at a price stated in the contract to be $75,000. Seventy-five hundred dollars was paid at the signing of the contract, and $11,400 was to be paid "immediately upon Buyer's obtaining a special permit enabling Buyer to erect a gasoline filling station upon the above described or adjacent premises" and $56,100 was to be paid at the time of settlement, which was to be not later than 485 days after the signing of the contract. Parcel A is south of the tract on which stand Taubman's and the A & P store. Parcel B, which is north and west of Parcel A and west of Taubman and the A & P store (and to the rear of the latter), was agreed to be conveyed by the other contract. It contains some 52,000 square feet and the price stated in the contract was $3,000, of which $300 was paid at the signing and $300 was to be paid upon the obtention of the gasoline station permit, and $2,400 at the time of settlement.

During June and July of 1958, Towson, as it was permitted expressly to do in the contracts, cleared and graded to the level of Dulaney Valley Road most of Parcels A and B. In the first week of October, 1958, Towson paved almost all of Parcel B. On October 15, 1958, Towson applied to a title company

for a title examination and policy with respect to Parcel B but not as to Parcel A. The title company notified Towson that it would issue a title policy without cemetery restrictions. On October 17, Towson notified Brooks' counsel that settlement would be held on October 20, 1958, as to Parcel B. The Brooks refused to settle for Parcel B unless there was settlement for Parcel A. The parties are in conflict as to what occurred at a meeting on the day settlement had been called for. Towson saying that Brooks' only objection was to settlement for Parcel B alone, and the Brooks saying that they then complained that Towson had breached the contracts as to Parcels A and B in that it had not applied for the permit for the filling station "forthwith" as the contract required, and had performed the "possessory act" of paving Parcel B without making the second of the scheduled payments which the contracts called for if possessory acts of that kind were performed.

On November 5, 1958, the Brooks instituted suit for a declaration as to their rights under the contracts.

The application for the special exception for the filling station was granted on November 24, 1958, and became final on December 5. On November 26 the *Hill* suit (which was decided February 11, 1960, by this Court) was filed in the circuit court, claiming that the 4-acre tract on which Towson had erected the stores was restricted to cemetery use. On December 22, the title company notified Towson's counsel that, pending the outcome of the *Hill* suit, they would not issue the title policy without the exception as to cemetery use. The contracts provided that in the event the title company should refuse to issue its policy free of restrictions as to cemetery use, the buyer had the right to declare the contract null and void. On January 9, 1959, counsel for Towson, while conducting a formal deposition of the Brooks, notified them that settlement for Parcels A and B would be held at the title company on January 12, and on that same day counsel for the Brooks notified counsel for Towson Realty that they were prepared for settlement on both parcels. Later the same day, counsel for Towson called off the settlement because the unrestricted title policies could not then be obtained.

At the trial the Brooks proffered testimony that Towson engaged a real estate broker to attempt to obtain from them a tract of land (a smaller version of what is now Parcel B) in the rear of the Taubman and A & P stores for a price of from $12,000 to $15,000. The Brooks categorically refused the offer, stating that they would not be interested in selling any portion of the back land unless the land fronting on Dulaney Valley Road also was bought. Further negotiations ensued and an agreement was reached for the sale of a parcel of land fronting on Dulaney Valley Road for 133 feet with a depth of 351 feet at a price of $500 a front foot, or $66,500. Thereafter, the parties agreed on the sale and purchase of land in back of this tract at a price of 44¢ a square foot which, after adjustments as to size, totalled $11,500. A contract was drawn in April, 1958, for the sale of the land to be conveyed by the Brooks individually at a price of $78,000, and counsel for the parties went over it clause by clause, making changes suggested by one or the other. As a result, a second contract calling for the same total acreage and price was prepared in May, 1958, by counsel for the Brooks and was delivered to counsel for Towson for execution. On May 16, 1958, counsel for Towson told counsel for the Brooks that his clients, for income tax reasons and for purposes of financing, would like to divide the land into parcels and to put a price of $75,000 on Parcel A, which was redescribed so as to have a depth of approximately 125 feet (which, of course, added correspondingly to the size of Parcel B), and a price on Parcel B as thus enlarged of $3,000. Counsel for the Brooks replied that this would be agreeable to his clients, saying in substance: "We don't care what you do with it as long as we get our money." Thereafter, three contracts, each dated June 7, 1958, covering Parcels A, B and C were signed by Towson and delivered to counsel for the Brooks with three separate checks, on the specific condition that the checks were not to be delivered until all of the documents had been signed.[3]

---

3. Parcel C is the lot which was held in the name of Prospect Hill Cemetery, Inc., a corporation wholly owned by the Brooks, and which is contiguous to Parcel B and was bought by Towson as part of the same transaction in which it bought Parcels A and B.

Included as part of the proffer were the drafts of the preliminary contracts and preliminary plats. At the conclusion of the proffer, the court asked counsel for Towson whether he would submit a contradicting proffer, and was answered that he would submit on the proffer by the Brooks.

Judge Raine rejected the proffer on the ground that the testimony was an attempt to add to or modify integrated written agreements by parol evidence, saying that "In order to make the performance of each contract contingent on the performance of the others, the Complainants must rely on a collateral oral agreement" and that since "* * * the rights of the parties would be seriously affected by the parol modification," the contract could only be treated as three separate and distinct contracts. He said further that there had been no material breaches of the contract as to Parcel B and that the contract as to Parcel A had been effectively disavowed by Towson on December 5, 1958, when the filling station permit became assured, because it did not then pay the second payment of $11,400 called for by the contract under such circumstance. The court treated the failure to pay as equivalent to exercising the option to cancel if an unrestricted title policy could not be obtained.

We agree that there were no material breaches as to the contract for Parcel B, but think there was no basis for the holding that there had been effective disavowal as to Parcel A by Towson. On January 2, 1959, in open court counsel for Towson said flatly that his client was willing to settle for all three parcels if a title policy free of cemetery restrictions could be obtained. On January 9, by letter, Towson's counsel notified the Brooks that several days later his client would settle for all three properties, and the Brooks agreed to make settlement at that time. Neither in pleading, testimony, brief or argument has Towson ever unequivocally taken the position that the contract as to Parcel A was not in force and effect. Time is not declared in terms to be of the essence of the contract and in view of the position of the parties and the fact that since the decision of the *Hill* case in February, 1960, it is conceded that the title policy free of cemetery restrictions can be obtained, there is no reason why Towson should now be able to disavow the contract on that ground.

We think the proffered testimony should have been admitted, although not to aid in determining the legal existence or validity of the contracts or in varying their terms. It was proffered not only to show that what purported to be three contracts were actually one contract, but for the purpose of showing misrepresentations and lack of good faith on the part of Towson. We think it was material to show the situation and background of the parties and the subject matter of the contracts at the time they were entered into and to aid the court in determining whether the contract as to Parcel B was one which a court of equity would specifically enforce.

In *Ginther v. Townsend,* 114 Md. 122, 128, a specific performance case, the Court said: "Parol evidence may always be resorted to for the purpose of explaining the position of the parties and of the subject matter and other surrounding circumstances at the time of concluding the contract, so that the Court may be put into the position of the parties, may see with their eyes, and may understand the force and application of the language employed by them." In *Dixon v. Dixon,* 92 Md. 432, 442, the Court adopted the language of the New Jersey court that "A purchaser, in resisting a claim for specific performance of the contract, is entitled to show, by parol evidence or otherwise, circumstances making it unconscionable or unjust to grant this relief, which is purely equitable, and which entitles him to insist that the vendor must be left to his remedy at law on the contract."

Whether or not the chancellor was right in decreeing specific performance as to Parcel B does not depend on whether the contract as to it was or was not separate and distinct from that as to Parcel A, or on whether the contract or contracts were valid and created rights and obligations enforceable at law. A contract entirely valid at law will not necessarily be enforced specifically by a court of equity. *Dixon v. Dixon, supra;* 5 Corbin, *Contracts,* Sec. 1164, p. 710. In Sec. 1162, at page 702, Professor Corbin puts the matter thus: "Facts that are not sufficient to invalidate a contract and that may nevertheless be sufficient to induce the refusal of a decree for specific enforcement are commonly segregated under such headings as mistake, innocent misrepresentation, unconscion-

able contract, inadequacy of consideration, harshness, oppression, sharp practice, overreaching, as well as hardship. * * * In combination several such facts may be sufficient to prevent specific enforcement, even though no one of them standing alone would be sufficient." See also Restatement, *Contracts,* Sec. 367.

In *Straus v. Madden,* 219 Md. 535, 543, the Court adopted the statement of Pomeroy, *Equity Jurisprudence,* 5th Ed., Sec. 928, pages 639-641 : "If there is nothing but mere inadequacy of price, the case must be extreme, in order to call for the interposition of equity. Where the inadequacy does not thus stand alone, but is accompanied by other inequitable incidents, the relief is much more readily granted. * * * When the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, oppression on the part of the one who obtains the benefit, * * * these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative." See also *Kappelman v. Bowie,* 201 Md. 86.

In *Perlmutter v. Bacas,* 219 Md. 406, 411, 412, the Maryland rule as to the granting of specific performance was restated in this wise: "A court of equity will decree specific performance almost as a matter of course if the terms of the contract are clear and unobjectionable, and although such relief is addressed to the sound discretion of the court, that discretion is not arbitrary. Where the contract is clearly established, it is the duty of the court to enter the decree. Nevertheless, the discretion of the court will be exercised to deny the relief where to grant it would be to compel the defendant to perform a contract which he did not intend to make or which he would not have entered into had its true effect been understood. 3 Pomeroy, *Equity Jurisprudence,* 5th ed., Sec. 860; 5 Williston, *Contracts,* Rev. Ed., Sec. 1427; *Somerville v. Coppage,* 101 Md. 519, 523-524; *The Glendale Corp. v. Crawford,* 207 Md. 148, 154; *Clark v. Kirsner,* 196 Md. 52, 56; *Kappelman v. Bowie,* 201 Md. 86, 89-90." The Court added: "Specific performance may be, and has been, refused where the innocent mistake is mutual or that of one side only. *Somerville v. Coppage, supra.* Cases in which

innocent misrepresentation as to a material fact was made by the vendor and specific performance was denied, include *Ginther v. Townsend,* 114 Md. 122; *Housing Engineering Co. v. Andrew Co., supra; The Glendale Corp. v. Crawford, supra.* Cases where the mistake was that of the vendee only and relief was denied include *Diffenderffer v. Knoche,* 118 Md. 189, 194-196; *Henneke v. Cooke,* 135 Md. 417; *Kappelman v. Bowie, supra."*

We think that in the case before us there was not only gross inadequacy of price if the contract as to Parcel B is considered without reference to the contract as to Parcel A, but also, at the least, a showing that the Brooks did not intend to make a contract which would convey Parcel B alone and would not have made such a contract had they understood this to have been its effect.

On the question of inadequacy, it was shown that the Brooks refused to consider the sale of the parcel of back land unless the front land was also taken. They finally agreed to a price of 44¢ a square foot for the back land provided that the front land was taken at a price of $1.77 a square foot. If the contract as to Parcel B is permitted to be enforced, Towson will acquire for about 6¢ a square foot all the land for which they originally agreed to pay 44¢ a square foot, plus considerable square footage for which they had originally agreed to pay $1.77 a square foot (since the land taken from the front parcel by the contracts now in question was added by those contracts to Parcel B). Thus, there is a gross, indeed a shocking, inadequacy of price if the contract as to Parcel B be treated as if it were the only contract, or as completely disassociated from the contract as to Parcel A.

Restatement, *Contracts,* Sec. 367, comment b says: "Mere pecuniary inadequacy of consideration will not generally make the terms of a contract seem too unfair for enforcement unless the degree of inadequacy is extreme." The Maryland cases have said that mere inadequacy of consideration is not enough to cause refusal of specific performance. But, generally, the reference has been to factual situations where competent parties had agreed upon a price which was low, or which later events indicated was low, and in such instances

72

bad bargains or a low price have been held not to be enough to deny specific enforcement. Cases are collected in a note in 65 A. L. R. 9. Cases showing that the majority rule is that mere inadequacy of consideration, without unfairness or overreaching in the procuring of the contract will not justify a denial of specific performance are collected beginning at page 86. The cases establishing the minority rule that inadequacy of consideration may be a sufficient ground for refusal to compel specific enforcement although the inadequacy would not be enough to entitle the defendant to a decree for rescission begin at page 89. In many jurisdictions in which it is held that mere inadequacy of consideration alone will not preclude the specific enforcement of a contract, the courts hold that if the inadequacy is so gross that it shocks the conscience of the court, it is satisfactory evidence of an unconscionable and unreasonable contract and the court will not enforce it specifically. The cases so ruling begin on page 91. See *Miller v. Coffeen* (Mo.), 280 S. W. 2d 100; *Linsell v. Halicki* (Mich.), 215 N. W. 315; *Rupniewski v. Miazga* (Pa.), 149 A. 193; *Panco v. Rogers* (Super. Ct. N. J.), 87 A. 2d 770; *Kelley v. York Cliffs Improvement Co.* (Me.), 47 A. 898; *Campbell Soup Company v. Wentz* (3rd Cir.), 172 F. 2d 80, 84 (the Court said that it did not suggest the contract was illegal or unenforceable but "[a]ll we say is that the sum total of its provisions drive too hard a bargain for a court of conscience to assist"). See also 3 Pomeroy, *Equity Jurisprudence,* 5th Ed., Secs. 926-927, and compare *Straus v. Madden, supra.*

Although to permit Towson to acquire for $3,000 land which the Brooks would not sell at any price, except in conjunction with the front land and which they sold for almost four times the $3,000 in connection with the sale of the front land, would seem to shock the conscience of any court and to render the contract as to the land unconscionable, we do not rest our conclusion that specific performance should not be granted as to Parcel B alone solely upon the inadequacy of the consideration.

We think it is manifest that the Brooks in good faith thought that the sole reason for execution of two contracts

and the division of the land to be sold into parcels was for the income tax and financing purposes of Towson, and that, in addition, they thought with reason that the option given to Towson to cancel the contracts if an unrestricted title policy was unavailable must be exercised as to all or not at all. To permit Towson to waive its right to cancel because of the title flaw as to Parcel B, but to insist upon this right in the case of Parcel A, so as to gain for itself the advantage of acquiring Parcel B at a price which was never contemplated by the Brooks, would produce a hardship on them and a most inequitable result—one which a court of equity will not aid in bringing about. Early in its history this Court said in *Carberry v. Tannehill,* 1 H. & J. 224, that for specific performance to be granted, the contract must not only have been full, fair and honest in the beginning but such that "the performance of it may be fairly and conscientiously required."

The texts and Maryland cases cited and relied on in *Perlmutter v. Bacas, supra,* make it plain, as that case held, that the discretion of the equity court will be exercised to deny specific performance "where to grant it would be to compel the defendant to perform a contract which he did not intend to make or which he would not have entered into had its true effect been understood."

We think the inadequacy of the price, the misunderstandings of the Brooks as to the effect of the contracts exercised in the manner that Towson has attempted to exercise them, and the harshness and inequitable result that would follow the granting of specific performance as to Parcel B alone, require, if chancellor grants specific performance as to Parcel B, that Towson must be required to settle for Parcel A at the same time. There can be no doubt that the court may decree specific performance conditionally. Restatement, *Contracts,* Sec. 359 (2), says: "The decree need not be absolute in form, and the performance that it requires need not be identical with that promised in the contract; it may be so drawn as best to effectuate the purposes for which the contract was made, and it may be granted on such terms and conditions as justice requires." To the same effect is 5 Corbin, *Contracts,* Sec. 1137. In *Willard v. Tayloe,* 75 U. S. (8 Wall.) 557,

567, 19 L. Ed. 501, 504, the Court said: "It must also appear that the specific enforcement will work no hardship or injustice, for if that result would follow, the court will leave the parties to their remedies at law, unless the granting of the specific relief can be accompanied with conditions which will obviate that result. If that result can thus be obviated, a specific performance will generally in such cases be decreed conditionally." In *Lissau v. Smith,* 215 Md. 538, 548, we required specific performance under a decree which would give sufficient time for the effective discharge of federal tax liens and which conditioned the obligation of the purchasers to pay only upon release of the liens.

> *Decree reversed, with costs, and case remanded for further proceedings not inconsistent with this opinion.*