Roland E. BARNES

v.

Abraham S. SIND and Israel Cohen, partners, trading as A. Sind & Associates, and Abraham S. Sind and Israel Cohen, individually.

Civ. No. 14155.

United States District Court
D. Maryland.

Nov. 12, 1963.

Joseph L. Rauh, Jr. and John Silard, Washington, D. C., and Eugene M. Feinblatt and Donald N. Rothman, Baltimore, Md., for plaintiff.

Morris D. Schwartz, Washington, D. C., and Edward Pierson, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

Plaintiff seeks specific performance of an agreement with defendants dated January 9, 1962, and liquidated damages for delay in performing, or, in the alternative, compensatory damages.

Each side claims that the other entered into the agreement in bad faith, and has unreasonably refused to perform or accept performance thereof. Defendant contends that the agreement is too vague to be specifically enforced, and that plaintiff failed to join as a party defendant the wife of Abraham S. Sind, who holds record title to the real property which plaintiff seeks to acquire by decree herein.

Plaintiff, a Negro, is and has been since May 1961 the principal of a school located about five miles from Rockville, in Montgomery County. His wife is employed by the County Board of Education in Rockville. At all material times they have lived at 310 Allison Street, N. W., Washington, D. C., about 16 miles from Rockville and about 22 miles from the school.

The complaint, as amended at the beginning of the trial, names as defendants Abraham S. Sind, Israel Cohen and Abraham S. Sind and Israel Cohen, partners, trading as A. Sind & Associates.

The individual defendants, Sind and Cohen, are associated in several business ventures, including the development of Regency Estates, the 189-acre tract involved in this case, which is located about 5 miles south of Rockville. They are interested in a number of corporations which build houses and do office work for other companies. The name A. Sind & Associates has been used by Sind and Cohen, alone or in association with their wives or in association with others, to designate various partnerships and joint ventures connected with the development of Regency Estates.

With money supplied by himself and one or more of his associates, Sind, as leader of the enterprise, purchased the 189-acre tract. It was the purpose of defendants and their associates to develop the 189 acres (tract) in a series of subdivisions, the first of which appears on the plat offered in evidence as PX 6. It contains 67 lots, which vary in size from about 9,000 sq. ft. to about 15,000 or 16,000 sq. ft., but are intended to be of approximately equal value when grading, drainage, trees, etc., are considered. Sind took legal title to the entire tract in his own name although others had a beneficial interest in it. Sind and his wife, Judy Sind, conveyed eight of the lots in the subdivision to Palro Homes, Inc., a few additional lots to other builders, and one or two lots to individuals, usually with the understanding that Sind and Cohen or one of their corporations would build the houses on the lots.

Sometime before October 1961 one of the groups trading as A. Sind & Associates built four model homes near the entrance to the subdivision; one was a two-story house known as the Georgetowne type. Shortly thereafter, 22 Georgetowne type houses were built on lots in the subdivision, most of them on land to which title had been retained in the name of Abraham S. Sind.

Sind and his wife entered into a sales contract with Harmony Corporation, under which Harmony was authorized to act as sales agent and to offer for sale 100 homes, including the 48 houses being built by Sind and Cohen and their corporations in the subdivision. Pursuant to that contract, Harmony caused to be published in the Washington Post an advertisement offering the houses for sale, calling the development Georgetowne Hill, and naming A. Sind & Associates as builders and developers. The advertisement gave the price of the Georgetowne type house, which was depicted in the advertisement.

In May 1961 plaintiff and his wife decided to buy a home in the Rockville area. Attracted by the advertisement in the Washington Post, plaintiff visited Harmony's office in one of the model houses and was shown several lots in the subdivision. Among others, he was shown lot 9 in block 3, on which construction of a Georgetowne type house had just begun. It was one of the largest lots in the development, with a stand of trees along the property line in the rear, giving promise of some privacy. The lot had the disadvantage of being the conduit for

storm water drainage from neighboring lots.

On the same day, October 9, 1961, plaintiff agreed to purchase that house and lot for $25,990, made a deposit of $200, together with his note for $800 payable in about ten days, and signed a memorandum of sale which was also signed "Harmony Corporation, by H. Glenn". The name of the seller did not appear on this document, and the place where the seller would ordinarily sign "ratifying, accepting and agreeing to the above memorandum of sale" was never completed or signed by anyone. On October 10, without prior consultation with defendants, Harmony wrote plaintiff and his wife, returning plaintiff's check and note, and stating: "We are sorry but this deal cannot be consummated at this time." The letter was sent and the check and note were returned to plaintiff because the responsible people at Harmony knew that defendants were unwilling to sell a lot in the development to a Negro.

Plaintiff then consulted Messrs. Rauh and Silard, Washington attorneys, who communicated with Harmony to find out the name of the seller. They were told to get in touch with A. Sind & Associates. Rauh wrote a letter to A. Sind & Associates, who in turn took the matter up with their Washington lawyer, Morris D. Schwartz. After negotiations by correspondence and conversations, a meeting was held in Rauh's office on November 28, 1961, attended by plaintiff, defendants and a voluntary conciliator. Three alternatives were discussed, namely, that defendants furnish plaintiff: (a) a roughly equivalent house in the Rockville area outside the development; or (b) a house to be built on a lot in another part of the 189-acre tract; or (c) a Georgetowne type house on one of 42 lots in the subdivision. Plaintiff was told that the lot covered by the October 9 sales contract was not available and would not be held, but he was not told until after July 31, 1962, that the lot had been sold to a third party.

Early in January 1962 after further negotiations and correspondence, Rauh proposed an agreement which provided for two alternatives: (a) the supplying of a substantially equivalent house in the Rockville area by January 30, 1962, or (b) the delivery of a Georgetowne type house on lot 9 in block 3 at any time between March 15 and August 31, 1962. The proposed agreement also called for arbitration of any dispute over the substantial equivalence of such other house in the Rockville area, and for "liquidated damages" in the amount of $100 a day for each day after August 31, 1962, that the completed house on lot 9 in block 3 was not delivered to plaintiff, with a limit of $15,000. The proposed agreement was not accepted by defendants, and Rauh threatened to file suit in this Court, with attendant publicity. Defendants were anxious to avoid such publicity, because they feared that if it were known that they had sold or might sell a house to a Negro, it would be fatal to the profitable development of the subdivision and the rest of the tract. Defendants were very anxious to obtain a respite—of two years, if possible, but at least until August 31, 1962—before word should get out that they were negotiating with a Negro.

Rauh finally gave defendants a deadline of noon on January 9, 1962, before which the agreement had to be accepted. He had already been in touch with Washington newspaper reporters, telling them of the proposed suit, and the newspaper reporters had in turn been in touch with defendants. On the evening of January 8, Cohen visited Rauh and agreed to a modification of the proposed agreement under which defendants would have an additional alternative, namely, (c) to furnish plaintiff on or before August 31, 1962, an identical Georgetowne type house on a lot in the subdivision equivalent to lot 9 in block 3. The so-called liquidated damages clause, to which Schwartz had objected on the ground that it was a penalty, was retained in the agreement which Rauh presented to defendants on the following morning.

That agreement, dated January 9, 1962, on which this action is brought, was signed by plaintiff, by Sind, by Cohen,

and by A. Sind & Associates per Cohen. Plaintiff was reluctant to sign the agreement because he did not believe, and still does not believe, that any of the lots on which Georgetowne type houses have been built, or any other lot in the development, is equivalent to lot 9 in block 3. On the other hand, he believed that some lots could be made equivalent. I find (1) that some of the lots were equivalent; (2) that counsel for plaintiff drove a hard bargain with defendants when he found that they could not stand the publicity, but that the facts proven do not amount to duress; and (3) that the provision for liquidated damages was intended to be a penalty. Although both parties were reluctant to enter into the agreement, I do not find that either side acted in bad faith or intended not to perform.

Defendants did not offer plaintiff either (a), a substantially equivalent house elsewhere in the Rockville area, nor (b), the house on lot 9 in block 3; so, shortly before July 31, 1962, Rauh suggested to Cohen that he get in touch with plaintiff in order that (c), a Georgetowne type house on an equivalent lot in the subdivision could be designated and the interior colors chosen. On July 31 Cohen took plaintiff and his wife to a house, No. 28 in block 2, and offered them that house. Lot 28 had been deeded to Palro Homes, Inc., some time before, but a Georgetowne type house identical to the house on lot 9 in block 3 had been built thereon by defendants or by one of their corporations. Defendants were willing and able, in good faith, to deliver that house and lot to plaintiff if plaintiff had accepted it, but the lot was not equivalent or substantially equivalent to lot 9 in block 3. It was one of the smallest lots in the subdivision, there was relatively little space between the house on that lot and the house on the lot to the rear, and there were no trees or bushes to give any privacy.

Plaintiff refused to accept the house on lot 28 in performance of the January 9 agreement, but offered to arbitrate the question of the equivalence of the lot. Defendants and their counsel, Schwartz, who had been named their arbitrator in the agreement, refused to arbitrate, stating as their ground the presence of the penalty clause in the contract. Plaintiff then refused to accept as performance of the contract any house on any of the lots remaining unsold unless defendants would agree to pay him $2,000 for trees, bushes, etc., which he considered necessary to make any remaining lot equivalent to lot 9 in block 3, and would also agree to pay his counsel fees. On those conditions plaintiff said that he would accept lot 38 in block 2, across the street from the lot he had originally chosen. The question of damages for delay was not raised at that time, but was raised after August 31, 1962. The parties were unable to reach any agreement, and after giving interviews to newspaper reporters, who in turn interviewed the neighbors, plaintiff filed his complaint herein on October 25, 1962, naming as defendants Sind, Cohen and A. Sind & Associates, described in the complaint as a corporation.

In his complaint plaintiff sought declaratory and injunctive relief in the nature of specific performance requiring defendants to comply with the terms of the January 9, 1962 agreement by delivering to plaintiff the completed house on lot 9 in block 3 or an identical house on an equivalent lot in the subdivision, liquidated damages, compensatory damages, an injunction pendente lite against defendants' selling 11823 Charen Lane (lot 38 in block 2, improved by a different type house), and other relief. In the complaint and at the hearing on the motion for preliminary injunction, plaintiff did not agree that lot 38 in block 2 or any other lot remaining unsold was equivalent to lot 9 in block 3. He did, however, file a letter from Rauh to Schwartz dated November 16, 1962, offering to purchase and take title to 11810 Smoke Tree Road (a Georgetowne type house) on the same conditions and at the same price stipulated with respect to lot 9 in block 3 in the October 9, 1961 memorandum of sale.

**576**

The letter also stated that, while achievement of such sale would moot plaintiff's request for injunctive relief, "it would not prejudice his existing right to damages for violation of the agreement of January 9, 1962."

After argument, this Court entered a preliminary injunction on December 6, 1962, restraining defendants from selling or offering for sale pendente lite 11810 Smoke Tree Road, finding that it was the remaining lot most nearly equivalent to lot 9 in block 3, but stating specifically that the preliminary injunction was not intended to prejudice any rights or points either side might rely on at the trial on the merits.

Counsel for plaintiff amended the complaint to include among the defendants in the case Abraham S. Sind and Israel Cohen, partners, trading as A. Sind & Associates, in substitution for A. Sind & Associates, a corporation. Counsel did not include among the defendants Judy Sind, wife of Abraham S. Sind, apparently because Washington counsel for plaintiff had not taken the trouble to check the land records to determine in whose name title to the several lots in question was held. They have generally treated this case as a crusade rather than as a civil action involving questions of fact and law.

Although defendants had raised the point that plaintiff's complaint indicated he was unwilling to accept any remaining lot as equivalent to lot 9 in block 3, counsel for plaintiff declined to amend his complaint to allege his willingness to do so. He has never conceded that any lot remaining unsold on July 31, 1962, is equivalent to lot 9 in block 3, but during the closing argument at the trial on the merits, after the evidence was in, counsel for plaintiff agreed to accept a conveyance of defendants' interest in 11810 Smoke Tree Road in full performance of the agreement of January 9, 1962, reserving only plaintiff's claim for liquidated damages or compensatory damages for delay.

*Discussion*

█ I. The agreement of January 9, 1962, upon which this action is brought, was not induced by duress on the part of plaintiff or his counsel; it was executed in good faith, albeit reluctantly, by both sides. It is a valid contract.

█ A contract entirely valid at law, however, will not necessarily be enforced specifically by a court of equity. Brooks v. Towson Realty, Inc., 223 Md. 61, 162 A.2d 431. For specific performance to be granted, the contract must be definite and certain in all its terms and free from all ambiguity. Trotter v. Lewis, 185 Md. 528, 532, 45 A.2d 329. See also Standard American Homes, Inc. v. Pasadena Building Company, 218 Md. 619, 147 A.2d 729; Peoples Drug Stores, Inc. v. Fenton Realty Corporation, 191 Md. 489, 62 A.2d 273; Baker v. Dawson, 216 Md. 478, 488–491, 141 A.2d 157; Neuland v. Millison, 188 Md. 594, 604, 53 A.2d 568.

In Trotter v. Lewis, supra, the Court said, 185 Md. at p. 535, 45 A.2d at p. 333: "But specific performance may be decreed if the terms of the contract are so expressed that the court can determine with reasonable certainty what are the duties of the parties and the conditions under which performance is due. The American Law Institute states: 'The usual aids to interpretation will be availed of by the court, just as in the case of enforcement by other remedies. Expressions that at first appear incomplete or uncertain are often readily made clear and plain by the aid of common usage and reasonable implications of fact. Apparent difficulties of enforcement due to uncertainty of expression may disappear in the light of courageous common sense.' 2 Restatement, Contracts, § 370."

█ The agreement of January 9, 1962, was not so indefinite or uncertain that it cannot be specifically enforced. This Court has readily concluded: (1) that lot 28 in block 2 is not equivalent to lot 9 in block 3, principally because of its small size and lack of trees or other

screening; and (2) that a number of other lots, including 11810 Smoke Tree Road and the lots adjoining lot 9 in block 3, are equivalent.

II. "[F]or specific performance to be granted, the contract must not only have been full, fair and honest in the beginning but such that 'the performance of it may be fairly and conscientiously required.'" Brooks v. Towson Realty, Inc., 223 Md. 61, 73, 162 A.2d 431, 437.

The agreement of January 9, 1962, meets that test. Defendants were desperately anxious to buy time, and plaintiff was willing to give them time, provided defendants would comply with any one of the three alternatives allowed them by the agreement. Having received the benefit of the agreement and having failed to perform two of the alternatives, (a) and (b), defendants cannot justly complain if the Court requires them to perform the third alternative, (c).

No. 11810 Smoke Tree Road is the only remaining lot in the development improved by a Georgetowne type house. Plaintiff has now agreed to accept that house and lot in performance of defendants' obligation under the January 9 agreement, without abatement for an alleged lack of equivalence in the lot. Defendants do not suggest that the lot is more valuable than lot 9 in block 3. The Court has found the lots to be equivalent. If plaintiff had been able to purchase another suitable house in the Rockville area, the Court would have denied specific performance and allowed damages for any difference between the cost of such other house and $25,990, the price fixed in the memorandum of sale of October 9, 1961, and in the agreement of January 9, 1962. But the equities of this case, together with the extreme difficulty, amounting to virtual impossibility of plaintiff's purchasing a suitable home in the Rockville area except by subterfuge, call for specific performance despite plaintiff's delay in agreeing to accept 11810 Smoke Tree Road, or any other house except the house on lot 9 in block 3, in performance of defendants' obligation under the January 9 agreement.

Such delay may, however, affect plaintiff's right to recover the damages which he claims.

III. The failure of plaintiff to join Judy Sind as a party defendant prevents the Court from granting any relief against her. Even if she is a member of some partnership or joint venture which trades under the name A. Sind & Associates, she is not a member of the partnership which was made a defendant by counsel for plaintiff at the beginning of the trial. The defendant partnership was specifically stated to be Abraham S. Sind and Israel Cohen, trading as A. Sind & Associates.

The evidence in this case indicates that legal title to 11810 Smoke Tree Road is held by Abraham S. Sind in trust for himself and his associates. That finding, however, is not binding on Judy Sind to destroy any dower right she may have, or to require her to join in any deed which the Court may require defendants to execute. Nevertheless, under established law, plaintiff may have a decree for specific performance against defendants, requiring them to convey any rights they may have in 11810 Smoke Tree Road, provided plaintiff is willing to pay the full contract price to defendants for their interest therein, without deduction for Judy Sind's possible dower interest. Schneider v. Davis, 194 Md. 316, 71 A.2d 32; Trotter v. Lewis, 185 Md. 528, 45 A.2d 329.

The Court will enter a decree requiring defendants to convey to plaintiff all their right, title and interest in and to 11810 Smoke Tree Road upon plaintiff's tendering to defendants within ninety (90) days from the date of the decree, the full balance of the purchase price called for by the memorandum of sale and by the January 9 agreement, without interest. That balance is $24,990.

The Court doubts whether plaintiff will be as well off under such a decree as he would have been if he had renounced the remedy of specific performance and sought to prove damages measured by the difference between $25,990, the price

fixed in the January 9 agreement, and the amount it would cost plaintiff to buy an equivalent house and lot in the Rockville area. Plaintiff may have to finance his purchase of 11810 Smoke Tree Road without having full title to the property. Nevertheless, after this problem was brought to the attention of plaintiff and his counsel, and they had had an opportunity for mature consideration, both plaintiff and his counsel elected to seek specific performance and damages for delay.

■ IV. Plaintiff is not entitled to liquidated damages. The Court has found as a fact that the provision for liquidated damages in the January 9, 1962, agreement was intended to be and was a penalty; it is, therefore, not enforceable.

Defendants' refusal, from July 31 until long after August 31, 1962, to convey to plaintiff any property in the subdivision except lot 28 in block 2 and the Georgetowne type house built thereon, was a breach of the agreement of January 9, because lot 28 in block 2 was not equivalent to lot 9 in block 3. Defendants' refusal to arbitrate the equivalence of the lot confirmed the breach.

Plaintiff's refusal thereafter to accept any of the remaining lots upon which a Georgetowne type house had been built, without an allowance of some $2,000 for planting, etc., was not justified, since some of the lots were equivalent to lot 9 in block 3. If no remaining lot were equivalent, plaintiff would not be entitled to specific performance, but only to damages for defendants' breach.

As we have seen, plaintiff did not agree until November 16, 1962, to accept 11810 Smoke Tree Road without reduction in the price for any alleged lack of equivalence; even then, he coupled his acquiescence with an assertion of his right to damages "for violation of the agreement of January 9, 1962". Presumably this vague phrase meant liquidated damages or compensatory damages for delay.

■ Plaintiff's evidence of damages consists principally of additional mileage

driven once or twice a school day by plaintiff and perhaps by his wife and some payments made to a friend who cared for their teen age daughter after school. All factors considered, the Court finds that this amounted to about $50 a week for the 30 weeks from November 16, 1962, to the end of the school year in June 1963. Therefore, the Court awards plaintiff damages of $1,500 for delays caused by defendants' breach not offset by plaintiff's delay in agreeing to accept an identical house on an equivalent lot.

Counsel will settle a decree within 10 days.