THOMAS M. SEALOCK ET UX. *v.* ELLSWORTH L. HACKLEY ET UX.

[No. 71, October Term, 1945.]

50

*Decided February 12, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, GRASON, HENDERSON, and MARKELL, JJ.

*Charles E. Hogg* for the appellants.

*Jerome A. Loughran* and *William Henry Forsythe* for the appellees.

DELAPLAINE, J., delivered the opinion of the Court.

The Circuit Court for Howard County, in a decree for specific performance, adjudged that Thomas M. Sealock and his wife, defendants, hold a certain lot of ground

with a right of way in the village of Savage in trust for Ellsworth L. Hackley and his wife, complainants, and ordered them to convey the land to complainants upon payment of the sum of $900, with interest from June 15, 1944. The appeal is from that decree.

It appears that Hackley operated a confectionery store on Baltimore Street and a pool room in the rear on a tract of land leased from the heirs of George W. Alcorn, deceased. On June 29, 1943, Hackley, desiring to purchase the rear portion of the tract, offered to sell his confectionery business to Sealock. He employed a neighbor, Thomas O. King, an attorney with law offices in Washington, to examine the title. The records disclosed that Alcorn had acquired the tract from Rosa W. Kingsbury without obtaining release of the dower interest of her husband, Albert T. Kingsbury. In August, Hackley paid Kingsbury $100 for a deed conveying that interest. In September, Sealock, accompanied by King, called upon James A. Alcorn, one of eighteen heirs, in Washington and offered $4,000 for the property; but Alcorn explained that they did not have a marketable title, but he had offered to sell their interest to Hackley. King, after acting as attorney for Hackley and Sealock, then agreed to represent the Alcorns. He offered to sell their interest for $3,700, provided that they would allow him a commission of $200. Shortly afterwards Hackley sold his confectionery business to Sealock for $6,000, and it was agreed that Sealock would get the front lot and also another lot, while Hackley would get the rear lot with right of way to the street. King prepared a deed for the Alcorn heirs with the understanding that, after they conveyed their interest in the entire tract to the Hackleys, the Hackleys would convey two lots therefrom to the Sealocks.

In January, 1944, King reported that the eighteen heirs had all executed the deed. Hackley and Sealock, however, asked for delay of several weeks in which to make their arrangements for settlement. When Sealock was ready,

Hackley requested that a survey be made. They accordingly employed a surveyor, who made a survey with their help and approval. In March it was agreed that Sealock would pay $2,800, and Hackley $900, thus producing the entire amount of the purchase price. King corroborated Hackley's testimony that he was to pay only $900. King drafted a deed intended for execution by the Hackleys, reserving a twelve-foot easement to the street. But Hackley was not satisfied with the deed. He demanded fee-simple title to the right of way, to which Sealock consented. In April a controversy arose over the amount payable by Hackley. It was learned that Kingsbury had died, and hence Hackley's deed was not needed to obtain a marketable title. On Saturday night, April 27, 1944, King came to Hackley's home, and warned him that unless he made immediate payment of $1,100, the heirs would convey the property to the Sealocks. Hackley conferred by phone with his own attorney, who advised him to wait until Monday morning. But King refused to wait; and the same night Alcorn, acting as agent for the heirs, agreed to convey the entire property to the Sealocks for $4,150. It has not been satisfactorily explained why the price was raised from $3,700 to $4,150. Nevertheless, in the following June the heirs conveyed the property to the Sealocks. Hackley was then notified to vacate the premises, and he replied that he wanted to carry out their agreement. The Sealocks sought to evict, whereupon the Hackley's brought the instant suit.

It is an outstanding fact in this case that the oral agreement was admitted by Sealock in his own testimony. He admitted that Hackley proposed that the property be purchased from the heirs, and that the proposal was satisfactory to him. He testified definitely that he was to pay $2,800, while Hackley was to pay $900. Therefore, the Statute of Frauds does not prevent enforcement of this agreement, after Sealock subsequently acquired the property from the heirs. As stated in *Trossbach v. Trossbach*, 184 Md. 47, 42 A. 2d 905, the ad-

missions of a party in the form of testimony constitute sufficient "memoranda" or "writings" under the Statute of Frauds, for recorded testimony is regarded as equivalent to signed depositions. The purpose of the Statute of Frauds is to protect a party, not from temptation to commit perjury, but from perjured evidence against him. Admissions of a party in testifying, while evidence in form, are in essence not mere evidence, but make evidence against him unnecessary.

The contention of appellants is that Hackley breached the agreement. They claim that he was indifferent and lacking in good faith. Hackley, however, testified that he was ready and willing to pay $900 in accordance with the agreement, but refused to pay $1,100 because he never agreed to pay that amount. He refused to make settlement on the night of April 27, 1944, but he was justified in asking that the transaction be deferred until Monday, especially since he was acting on the advice of his attorney. His request to defer settlement for one day was not unreasonable and did not constitute a repudiation or breach of the agreement. Repudiation by one party to an executory contract, which will excuse performance by the other, must be absolute and unequivocal. *Fayette-Kanawha Coal Co. v. Lake & Export Coal Corporation*, 91 W. Va. 132, 112 S. E. 222, 23 A. L. R. 565.

Of course, a person cannot obtain specific performance of a contract unless he has shown himself ready and willing to perform everything to be done on his part. *O'Brien v. Pentz* 48 Md. 562, 577; *Raith v. Cohen*, 142 Md. 38, 119 A. 700. A person who has entered into a contract to purchase property may lose his right to specific performance by gross laches and unreasonable delay in paying the purchase money, especially when the property has greatly increased in value, or there are circumstances which would make such a decree inequitable. *Derrett v. Bowman*, 61 Md. 526, 528; *Soehnlein v. Pumphrey*, 183 Md. 334, 37 A. 2d 843, 846. Where, however, the purchaser has not been grossly negligent, but in-

vokes the aid of equity in good faith and with reasonable diligence, and the situation of the parties has not changed, the court will not refuse to decree specific performance merely because he did not comply strictly with the terms of the contract. Even where there is a stipulation as to the time for payment of the purchase price, equity does not generally regard this as a condition which requires strict performance to entitle the purchaser to have the sale consummated. *Pratt v. Gray,* 139 Md. 472, 115 A. 764. In the instant case time was not of the essence of the contract. The parties understood that it might require considerable time to obtain the signatures of all the grantors and to consummate the transaction. They did not even consider it necessary to put their agreement into writing. There was no definite time within which the agreement was to be consummated. Where time is not of the essence of the contract, mere delay in performing within a specified time, if not unreasonable in extent, will not justify rescission of the contract. *Ady v. Jenkins,* 133 Md. 36, 40, 104 A. 178.

For these reasons, we will affirm the decree of the chancellor ordering specific performance of the oral agreement.

*Decree affirmed, with costs.*