OREGON RIDGE DINNER THEATRE, INC., ET AL.
*v.* HAMLIN, ET AL.

[No. 239, September Term, 1968.]

*Decided May 8, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, McWILLIAMS, FINAN and SMITH, JJ.

*George W. McManus, Jr.,* for appellants.

*R. Taylor McLean,* with whom were *Royston, Mueller,
Thomas & McLean* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

We reach now the final phase of protracted skirmishes be-
tween the appellant Dorsey, the original promoter of the Oregon
Ridge Dinner Theatre in Baltimore County who ran the project
as if he were its alter ego, and the appellees, financial backers
of the theater who ousted Dorsey after they became irked by
his blatant failures to keep financial records, to account for re-
ceipts and disbursements, and to pay bills including those for
taxes due the federal government, failures which were com-
pounded by his continual appropriations to his own use of mon-
ies and chattels belonging to the theater.

Henning, Hamlin and Anthony of Richmond (the investors)
were enticed by Dorsey to invest money in a dinner theater
to be operated by him in the ski lodge in the Oregon Ridge
ski and recreation area and a corporation was formed, herein
called Oregon, with Dorsey holding 55% and each of the others
15% of the stock. American Conservation Trustees, Inc. (ACT),
which leased and operated the ski slopes permitted Oregon to
operate the theater in the lodge for several months. Although
this operation lost money the investors were not discouraged
and decided that a new corporation, herein called Eastern, of
which Henning, Hamlin and Dorsey each would own a third,

would be formed to lease land from ACT and build thereon a structure specially planned as and designed for a dinner theater. This was done and the theater was erected at a cost to the investors of some $67,000. To promote its interests, ACT require that Eastern, its lessee, operate the theater under the name of Oregon Ridge. Eastern could, under the lease, sublease to Oregon but was not required to do so. The new theater opened in June 1966 with Oregon as producer in name but with Dorsey in complete charge. There were discussions of and plans for a sublease from Oregon to Eastern but none was agreed on and Oregon occupied the theater building by permission of Eastern.

On February 6, 1967, the investors caused Eastern to withdraw its permission to Oregon to occupy the theater and take over the production of plays under Dorsey's supervision, using in part some of Oregon's chattels and cash. Dorsey, as part of the agreement for his hiring by Eastern, acceded to the imposition upon him of a financial discipline and full accountability, an agreement he honored in the breach rather than in the observance, so much so that he was discharged and ousted from the premises in June 1967, after he had cashed large checks of Eastern and appropriated to his use their proceeds.

Thereafter Dorsey harassed Eastern in various petty ways, such as attempting to divert its mail, oust actors from a residence arranged for them, and tie up the theater's telephone during busy hours. Eastern filed a bill against Oregon and Dorsey to enjoin these practices and for an accounting as an employee of Eastern and manager of Oregon.

Oregon and Dorsey filed a cross-bill against the investors and Eastern, praying that the corporate acts of Oregon relied on by the investors to accomplish the revocation of permission to Oregon to use the theater and to deliver to Eastern substantially all the corporate assets of Oregon (resolutions of the directors of Oregon rather than the acts, including the affirmative vote of two-thirds of the stockholders, required by Code (1966 Repl. Vol.), Art. 23, § 66, and the Bulk Sales provisions of the Uniform Commercial Code) be declared void, that the investors be required to deliver to Oregon all of its assets and "all control, possession and occupancy of the business of the dinner theater located at Oregon Ridge," and that the in-

vestors and Eastern account for all receipts and disbursements of the theater from June 30, 1967 on.

Under an agreement of the parties, Judge Raine appointed a special master to audit the books and records of the dinner theater for the period from June 1965 to July 1967.

The special master found the accounts of Oregon to be so incomplete as to frustrate a precisely accurate accounting on all aspects, but after extensive discovery he did file a report. Thereafter the case came on for trial in February 1968 and after considering much testimony and other evidence, Judge Raine entered a decree enforcing his findings of fact and conclusions of law, which may be summarized as follows:

(a) that Dorsey was indebted to Oregon Ridge in the amount of $17,978.23 for money taken by him from the theater up to February 6, 1967, after giving him credit for salary; (b) that Dorsey was indebted to Eastern in the amount of $13,016.12 for money taken by him while in its employ from February to June 1967 (after credit for salary); (c) that Eastern was entitled to a monetary decree against Oregon Ridge for advances [in the amount of $27,392.14]; (d) that Oregon Ridge had no lease of the theater property, and, thus, was rightfully ousted from the premises by Eastern on February 6, 1967; (e) that Oregon Ridge was insolvent as of February 1967; (f) that Oregon Ridge had some assets when it was ousted from the premises by Eastern but that it was impossible to determine from the available evidence what such assets were or what their value was; (g) that Eastern failed to offer evidence sufficient to establish what sum, if any, should be paid by Oregon Ridge to it in the nature of rent for the use of the theater premises; (h) that there was no compliance with the provisions of the Maryland corporation law applicable to the transfer of all or substantially all of Oregon Ridge's assets but that Dorsey and Oregon Ridge were not in a position to complain of this; and (i) that the agreement to redistribute the stock of Oregon Ridge, 25% to each of

the individual parties in the case, should and would be enforced.

Dorsey and Oregon in their appeals make only three challenges to the decree:

1. The validity of the transfer of assets from Oregon to Eastern;
2. The enforcement of the oral agreement to redistribute the stock of Oregon;
3. The propriety of entering an unasked for monetary decree in favor of Oregon, one defendant and cross-complainant against Dorsey, another defendant and cross-complainant.

After arguing these points, appellants urge in the conclusion to their brief that "the status quo of Oregon Ridge and Dorsey should each be restored as of February 5, 1967," and that Oregon "should be restored to its operation of the [theater]."

Were we persuaded that Oregon and Dorsey should prevail, which we are not, we could not, any more than could all the King's horses and all the King's men put together for further operation the Humpty Dumpty that was the Dorsey reign as Oregon's alter ego. The chancellor found that Oregon was insolvent on February 6, 1967. Its charter was "repealed, annulled and forfeited" on January 17, 1968, for nonpayment of taxes and failure to file reports, and has not been reinstated. There is no Oregon to put together and if there were, we would not experience any urge to try to do so. No equities support appellants. The piper was paid by the investing "angels," principally by Henning the archangel, with $67,000 or more of their money and they had both the legal and the moral right to call the tunes they did under the circumstances, even though Dorsey found the resulting music less than heavenly.

We turn to detailed consideration of appellants' contentions. It is obvious, as Judge Raine found, that § 66 of Art. 23 of the Code was not complied with. Nevertheless we think Judge Raine was right in refusing to allow Dorsey and Oregon to benefit from this failure.

No creditor of Oregon has complained—it is to be inferred that Eastern paid off Oregon's creditors. Dorsey failed to

prove what assets of Oregon went to Eastern, but resolving every doubt in his favor their maximum value was some $24,600. The chancellor found as a fact that Dorsey owed Oregon some $17,000. If Dorsey's claim that he still owned 55% of Oregon be assumed to be correct, his equity in the $24,600 would have been at most $13,530, some $3,500 less than he owes Oregon. Further, Dorsey, the chancellor permissibly found, acquiesced in the substitution of Eastern for Oregon as the producer at the theater and in the use by Eastern of whatever assets Oregon had, insolvent as it then was. Dorsey accepted employment by and salary from Eastern as part of the new deal and opened an account in Eastern's name of $3,500 of Oregon's cash. Two stockholders' meetings of Oregon were called by Dorsey after Eastern took over and not only was the new arrangement not repudiated by Oregon, it seemingly was accepted and agreed to be implemented by an accounting—never furnished—of Oregon's stewardship (or lack of it) while it nominally was the producer. As Judge Brune for the Court said in *Baumohl v. Columbia Jewelry Co.,* 209 Md. 278, 286, in indicating that the conduct of the complainant there would estop him from the right to complain of failure to comply with §§ 62 and 66 of Art. 23 of the Code: "we think that the appellants have failed to state a case for the interposition of an equity court."

Appellants say the chancellor erred in finding that the stock of Oregon was owned equitably in equal 25% shares by Henning, Hamlin, Anthony and Dorsey because the agreement to so redistribute the stock from a 55% ownership by Dorsey and 15% ownerships by Henning, Hamlin and Anthony was oral and its enforcement therefore is barred by the Uniform Commercial Code's statute of frauds provisions, found in Code (1964 Repl. Vol.), Art. 95B, § 8-319. That section provides that:

> "[a] contract for the sale of securities is not enforceable by way of action or defense unless (a) there is some writing signed by the party against whom enforcement is sought [which gives specifics] * * * or (d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in

> court that a contract was made for sale of a stated quantity of described securities at a defined or stated price."

The chancellor found as a fact, justifiably we think, that in December 1965 an agreement was reached by and between Henning, Hamlin, Anthony and Dorsey that if Henning put up or made available the money necessary to build the new dinner theater, Dorsey would transfer 10 of his shares in Oregon to each of the other three. Henning put up some $67,000 and the theater was built. This may have been enough to gratify the statute, *Read Drug & Chemical Co. v. Nattans,* 129 Md. 67, and *Read Drug & Chemical Co. v. Nattans,* 130 Md. 465, but it is unnecessary to decide that point, and we do not, because Dorsey conceded on the record that there was such an agreement. He attempts to escape its bind by saying that each of the four was to guarantee a loan of the necessary funds and he was to get an employment contract to run the theater, and because he did not guarantee the loan and was not given a written contract, the agreement cannot be enforced.

If the agreement be assumed to be one for the sale of 30 of Dorsey's shares, we think that Dorsey's concession of record that such an agreement was made gratifies the statute. The contention that because Dorsey was not called on to make good on his onerous promise to guarantee the loan, he was excused from his promise to transfer 30 shares of his stock to the investors is fanciful. Dorsey was given employment at the theater until his disloyal behavior caused his discharge and the chancellor found as a fact, again justifiably in our view, that the contract of employment was not formalized because of Dorsey's deliberate choice "and he can't complain" because "Dorsey always kept putting it off and kept saying 'Well, we will talk about it later,' manana and manana; tomorrow never came."

Appellants' final argument also must fail. Code (1951), Art. 16, § 215, in its second sentence provided, as did Equity Rule 31, that to prevent a multiplicity of suits an equity court could:

> "according to the special circumstances of the case,

to meet the requirements of justice ** * decree [between plaintiffs and between defendants] as if they occupied positions of plaintiff and defendant upon the record, * * * provided such decrees shall be founded upon the allegations of the pleading between the plaintiffs and defendants, and have immediate connection with the subject-matter of the suit."

The Court of Appeals by rule superseded Equity Rule 31 and the second sentence of § 215 of Art. 16 of the Code by Rule 3 of Part III of the General Rules of Practice and Procedure (see Volume 3 of the Code of 1951, page 4871 and page 4873), and § 215 of Art. 16 was repealed by Ch. 399 of the Laws of 1957. Rule 3 of Part III of the General Rules of Practice and Procedure, now Maryland Rule 314, permits but does not require a defendant to assert a claim against another defendant. Appellants argue from all this that "it was arbitrary for the Trial Court to assert a claim for Oregon and grant it relief thereon when Oregon never asserted such a claim."

We do not agree. Equity Rule 31 and the second sentence of § 215 of Art. 16 of the Code of 1951 did not create the power and right in a court of equity to decree between co-defendants, they merely recognized and declared that power and right. Miller, *Equity Procedure,* says in § 265:

"Independently of the present equity rule a court of equity has ample power to decree between co-defendants and also between co-plaintiffs, having full power to so frame and mould its remedy as to do complete justice to all parties to the cause; and it is said that the court not only may, but must as a duty, decree between co-defendants where the matter comes fully before it, and a case is fully made out between them, so that the whole controversy may be finally and at once closed. And while as a general principle it is true that if the plaintiff can with certainty get at his rights and have them determined without trying and deciding a case as between co-defendants, the court will not enter into such a case; yet it will do so as between the co-defendants whenever it is neces-

> sary for a fair determination of the plaintiff's case. A decree between co-defendants grounded on the pleadings between the plaintiffs and defendants, may be made in order to prevent multiplicity of suits, and it is the constant practice to do so; but such decree between co-defendants must be based upon, and connected with the subject-matter in litigation between the complainant and one or more of the defendants."

The cases support the text. See *Neal v. Rathell,* 70 Md. 592, 599.

We find no intention in the adoption of the rule of joinder or in the housekeeping repeal of § 215 of Art. 16 of the Code to take away an inherent equitable power of long standing.

It was entirely appropriate here for the chancellor to adjudicate all rights involved in the accountings before the court. At Oregon's meeting of February 24, 1967, called and controlled by Dorsey, it was resolved that Dorsey would cause to be made a full audit of Oregon's books from June 17, 1966, through February 26, 1967, and prepare a true corporate financial statement. During the progress of the litigation, Dorsey agreed to the appointment of an auditor and turned over to the special master his personal books and records and some of those of Oregon. The special master's report was introduced at the trial without objection and no claim was then made or has since been made that Dorsey was not indebted to Oregon, and no challenge has ever been offered to the accuracy of the amount shown by the report to be due or to the chancellor's subsequent finding that Dorsey did owe Oregon that amount.

*Decree affirmed, with costs.*