## ADAMS *v.* WILSON

[No. 145, September Term, 1971.]

*Decided December 14, 1971.*

The cause was submitted on briefs to HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

Submitted by *Emerson C. Harrington, Jr., Edward H. Nabb* and *Harrington, Harrington & Nabb* for appellant.

Submitted by *George J. Goldsborough, Jr.,* for appellee.

BARNES, J., delivered the opinion of the Court.

This appeal involves primarily the enforceability and construction of an oral contract to purchase a one-third interest and become a partner in a partnership of practicing accountants in Dorchester County.

Robert C. Wilson, the appellee and a certified public accountant, and Vernon Robbins, a member of the Maryland Bar and also a certified public accountant, formed a partnership in June, 1956, as an accounting firm under the name of Robbins and Wilson. The appellant, Thomas H. Adams, Jr., a certified public accountant, was employed by that firm on July 6, 1966, on a salary basis. Adams desired to become a partner. After much discussion, the two partners, Robbins and Wilson, about

August 1, 1967, permitted Adams to purchase a one-third interest in the partnership and become a one-third equal partner.

The purchase arrangement was oral. Wilson testified that the oral agreement was that Adams was to pay $30,000 for the one-third interest of which $20,000 was to be paid immediately—$10,000 to Wilson and $10,000 to Robbins, individually—and that the remaining $10,-000—$5,000 to Wilson and Robbins respectively—would be paid from earnings of Adams from the partnership in any fiscal year (June 1 to May 31) over $20,000.

Robbins testified that the background of the purchase agreement was as follows:

> "We talked around a figure of $20,000 at that particular time. It is very difficult to determine valuation of a service, a partnership such as CPA, and we dickered back and forth and talked back and forth, and then one day Tommy [Adams] came in and said that he could arrange $20,000. I discussed this with Bob [Wilson]; we had meetings separately and together — Oh, maybe a month or so, and I went in and discussed with Bob, and I told Bob that Tommy could raise $20,000. Bob at that time said he thought the partnership was worth more than that. I said I don't really think so, but I want you to be agreeable with it. Bob mentioned a figure of $30,000, and I came up with the idea— Well, Tom had to borrow this money— and Tom sat down and discussed it with Bob, saying this was all he could afford, that his payments, I think, would be five years at $400 a month. If he earned $20,000 a year after paying his income tax, paying mortgage, and paying this note he wouldn't have much left over."

He then stated that he and Wilson understood that $20,000 was the limit Adams could borrow; and in due course, Adams paid him and Wilson $10,000 each by

check. Adams was then admitted as a member of the partnership.

In regard to the additional $10,000 payment over and above the $20,000, Robbins stated:

"* * * Mr. Adams was to pay an additional $10,-000, but in view of his financial condition he was—In view of the fact that up to $20,000 he would just have about enough to live, to pay his note off and pay his income tax, we agreed after the $20,000 he would repay the $10,000 out of profits out of the partnership to the extent of one-half of the profits he received over $20,000. This was done with the reason that he had taxes to pay on this and he wouldn't have the whole profit of over $20,000."

Robbins further stated that, if the income of Adams from the partnership never exceeded $20,000, Adams would not have been indebted to either Wilson or himself.

Adams testified that in the original negotiations to purchase a partnership interest, the purchase price of $20,000 had been discussed. He made arrangements with a local bank to borrow this sum. Later, the purchase price of $30,000 was discussed and agreement was reached in regard to this amount. He stated:

"We had a lot of discussions about the value of the business, and the figure of $20,000 was brought up. I was unable to get $30,000, and it was suggested that the business was worth $30,000. I had the $20,000, and there was a discussion about the other $10,000. I talked with Mr. Robbins and Mr. Wilson about this at great length, and it was decided that when my share of the profits exceeded $20,000 that one-half of any amount over $20,000 would be payable to Mr. Robbins and Mr. Wilson out of my share of the profits from Robbins and Wilson. Of course,

this is the only means and source of income that I have had, and have."

He testified that it was clear in his mind that the discussion was about one-half of over $20,000 per year income. He then stated:

"I had discussions on this particularly with Mr. Wilson about this in excess of $20,000. I had worked out a program in order to borrow the money, on the $20,000 to be paid back over a five-year period, the terms of the bank that I had to accept, it would take approximately $5,000. Taxes on $20,000, federal and state, self-employment, would be approximately another $5,000, which left, of course, $10,000 to live on, which cut it pretty close. So, when they were talking about the additional $10,000, it would be impossible. It was mentioned at one time about anything over $20,000—but, I brought up to Mr. Wilson about if I have to pay taxes on the amount over $20,000, and I don't get any of the money, I just wouldn't have any money to pay the taxes on. So, it was agreed, with my understanding, it was agreed among the three of us that it would be one-half of the amount so I would have sufficient cash to pay the taxes. In fact, Mr. Wilson made the point to tell me that, of course, your tax rate wouldn't be 50 percent, you know, in the particular matter."

He testified on cross-examination that he understood that the one-half of the amount earned by him over $20,000 in any one year was to be divided equally between Wilson and Robbins, and that he did not understand that if Robbins chose to forgive his claim, the entire one-half could be fully applied to the remaining obligation.

Mrs. Wilson, wife of one of the partners, had been employed by the partnership for several years. She and

Adams apparently did not get along and in May, 1969, Adams "asked Mr. Wilson very strongly" that Mrs. Wilson be fired. Mrs. Wilson was called in and Adams told her why he would like to have her fired and why he wished this. She got up and left the office and the employment of the firm.

Several days later, Wilson told the other partners that he was dissolving the partnership. On May 29, 1969, a written agreement was executed by Wilson, Robbins and Adams whereby Robbins and Adams would pay Wilson one-third of the bank account of Robbins & Wilson, one-third of the agreed fair market value of the equipment, furniture and fixtures and one-third of the agreed value of the accounts receivable of Robbins & Wilson. The one-third of the bank account and one-third value of the equipment, furniture and fixtures were to be paid at the time of settlement and the one-third of the fair market value of the accounts receivable would be paid Wilson at not less than $1,000 a month on and after June 15, 1969, until paid. Wilson was to bill certain listed accounts and there were provisions in the contract of May 29, 1969, for adjustments of the balance agreed upon if payments were erroneously made on the listed accounts.

After the contract of May 29 was signed, Wilson asked Adams what he was going to do about the $5,000 he owed Wilson. Adams told Wilson that rather than Adams owing Wilson $5,000, Adams "felt that morally and literally" Wilson should return to Adams the $10,000 already paid Wilson.

For the year ending May 31, 1969, the earnings of Adams from the partnership amounted to $28,650.76. For the first ten months of the new partnership, Adams only earned $16,094.84 so that no payment on the balance of $5,000 due Wilson and Robbins was demanded or paid.

Robbins testified at the hearing before Judge Mace that he made no demand on Adams for his $5,000 and

that he did not consider that that obligation existed. In response to a question by the trial court, Robbins stated that his decision not to demand the $5,000 from Adams was his "personal decision" and was his "decision entirely."

After the dissolution of the partnership, Robbins and Adams formed a new partnership to engage in accountancy and this new partnership continues.

On July 31, 1970, Wilson filed an action against Adams in the Circuit Court for Dorchester County to recover $5,000, alleging that the purchase price of the one-third interest in the partnership was $30,000 of which $15,000 was payable to Wilson and of which only $10,000 had been paid. Adams pleaded the general issue pleas in assumpsit and special pleas of accord and satisfaction and discharge.

Judge Mace, after hearing all of the testimony, considering the exhibits and memoranda filed by counsel for the parties, filed a written opinion on April 16, 1971. He found the following facts in regard to the oral contract of purchase of the partnership interest by Adams:

"A purchase price of $30,000 was ultimately agreed upon, $15,000 to be paid to Robbins and $15,000 to Wilson, in return for a one-third interest in the partnership to be known as Robbins, Wilson and Adams. Adams was unable to borrow but $20,000, which he paid to Robbins and Wilson, $10,000 to each. This money was deposited in the personal accounts of Robbins and Wilson, and was not treated in any manner as partnership assets. It was further agreed that Adams would pay the remaining $10,000, $5,000 to each partner in the future. It is Wilson's recollection that Adams was to pay to Wilson and Robbins all of his earnings in excess of $20,000 per year, while both Robbins and Adams are positive that the agreement was to pay one-half of such excess until the balance was paid. In

view of his obligation to repay the $20,000 loan and his tax and family obligations, the one-half figure is more realistic, and I so find. There were no written partnership agreements or other documents relating to the formation of the partnership and no discussion of the intended duration of the partnership, although all three men apparently felt that it would continue indefinitely."

Judge Mace ruled against the contentions by Adams that the obligation to pay the $5,000 to Wilson was extinguished by Wilson's leaving the partnership, that the oral contract was unenforceable because of the provision in the Statute of Frauds in regard to contracts not to be performed within a year and that there had been an accord and satisfaction.

He directed the entry of judgment for $4,325.38 and costs in favor of Wilson against Adams, observing that "Robbins having waived any claim to these funds, they must be applied to the obligation from Adams to Wilson." From the judgment duly entered in accordance with the lower court's direction, this appeal was timely taken.

Adams makes five contentions before us:

1. Recovery by Wilson was barred by the Statute of Frauds.

2. There were two separate contracts, one satisfied by the immediate payment of cash and the other precedent upon a future event.

3. Wilson defeated his claim by leaving the partnership when he did.

4. The subsequent written contract merged all accounts between the parties.

5. In any event, Wilson was not entitled to more than $2,162.69, not being entitled to the one-half of the one-half of excess income payable to Robbins.

We will now consider these contentions in the order indicated.

## 1.

Section IV, Clause 5 of the Statute of Frauds, 29 Car. II C. 3 (enacted 1676, effective 1677), Alexander's British Statutes (Coe ed. 1912), in force in Maryland subsequent to July 4, 1776, by the provisions of Article 5 of the Declaration of Rights of the Maryland Constitution, requires a memorandum signed by the party to be charged for the enforcement of contracts "not to be performed within the Space of one Year from the making thereof."

Adams contends that in view of the finding that the oral contract in regard to the deferred payment of $10,-000 was conditioned upon his share of the profits from the partnership exceeding $20,000 *in any one year,* the contract was within the meaning of Section IV, Clause 5 of the Statute of Frauds.

There are two answers to this contention. The first answer is that, as construed by the English Courts and by this Court, it is only when performance of the oral contract is *impossible* during the year period will this provision of the Statute of Frauds bar recovery. We held this in *Sun Cab Co. v. Carmody,* 257 Md. 345, 349-50, 263 A. 2d 1, 3, 4 (1970) where Judge McWilliams, for the Court, fully reviewed the prior decisions of this Court on this subject.

The second answer is that Adams testified at the hearing that this was a provision of the oral contract, and this is sufficient memorandum to satisfy the Statute of Frauds. As Chief Judge Brune stated, for the Court, in *Pollin v. Perkins,* 223 Md. 532, 539-40, 165 A. 2d 908, 911 (1960) :

> "* * * [One of the appellants and defendants below acknowledged] these documents as his agreements. His recorded testimony adopting them is, however, of itself sufficient to satisfy

the requirements of the Statute of Frauds. *Trossbach v. Trossbach,* 185 Md. 47, 52-53, 55, 42 A. 2d 905; *Sealock v. Hackley,* 186 Md. 49, 45 A. 2d 744. We quote from the latter (186 Md. at 52-53): 'As stated in *Trossbach v. Trossbach,* 185 Md. 47, 42 A. 2d 905, the admissions of a party in the form of testimony constitute sufficient "memoranda" or "writings" under the Statute of Frauds, for recorded testimony is regarded as equivalent to signed depositions. * * * Admissions of a party in testifying, while evidence in form, are in essence not mere evidence, but make evidence against him unnecessary.' This was no case of mere passive acquiescence on the part of the holder of an inchoate dower right, as in *Alvey v. Alvey,* 220 Md. 571, 155 A. 2d 491. In reaching the conclusion that Morris Pollin did adopt these documents and is bound by them, we do so on the basis of the *Trossbach* and *Sealock* cases, without regard to questions of equitable estoppel or agency."

To the same effect see *Oregon Ridge v. Hamlin,* 253 Md. 462, 468, 253 A. 2d 382, 385 (1969). Cf. *Lambdin v. Przyborowski,* 250 Md. 108, 111-12, 242 A. 2d 150, 152-53 (1968).

### 2.

Adams contends that there were *two* contracts—one for the immediate payment of $20,000, $10,000 to each of Wilson and Robbins, which was completed by the $10,000 payments to each of them; the other, for the payment of an additional $10,000, $5,000 to each of Wilson and Robbins with a condition precedent, however, that there be the earning of profits each year from the three-man partnership.

There are two reasons why this contention is, in our opinion, unsound. First of all, there is no evidence produced which would show that there were *two* contracts. The mere fact that payment of a portion of the purchase

price was deferred would not create a dual obligation or two contracts. Adams immediately upon the oral agreement entered into the new three-man partnership and began to enjoy the benefits of his new status while indebted for a portion of the price agreed to be paid for the acquisition of this new status. The trial court found that the payment of one-half of Adams' profits over $20,000 was *a minimum;* and it would not have been impossible for Adams to have obtained funds from other sources to pay the amount due, the agreement not preventing Adams from doing this. This finding is inconsistent with the contention that there were *two* contracts.

Secondly, this contention was not raised below and not specifically considered or decided by the trial court. The point is not preserved for appellate review. Maryland Rule 885.

### 3.

Adams further contends that Wilson defeated his claim against Adams by leaving the three-man partnership prior to one year after Adams formed the partnership or prior to the end of the fiscal year ending May 31, 1969.

The answer to this contention is that there is no obligation under the oral contract as found by the trial court which imposes any obligation upon any of the partners to continue in the three-man partnership for any period of time as a condition to the deferred obligation. True, an early dissolution of that partnership might result in Adams not earning a sufficient amount over $20,000 in any one year to pay the obligation in full, but that does not impair the obligation itself incurred at the time the oral agreement was made. There is little question that, there being no definite term specified for the duration of the partnership, Wilson, as well as the other partners, had the right to dissolve it at any time without contravention of the partnership agreement. Code (1970 Repl. Vol.) Art. 73A, § 31 (1) (b). *Cohen v. Orlove,* 190 Md. 237, 57 A. 2d 810 (1948). In the in-

stant case, the unpleasantness in regard to the termination of the services of Mrs. Wilson occurred on May 19, 1969. Wilson told Robbins that he was going to take a couple of days off so that all of the partners would have an opportunity to think the matter over. This was done and later Wilson dissolved the partnership on May 29. There was no failure on the part of Wilson to perform under any partnership agreement.

### 4.

Adams also contends that the execution of the written contracts on May 31, 1969, in regard to Wilson's share of the partnership assets upon dissolution merges all accounts between the parties.

The trial court considered this point as being an alleged accord and satisfaction of the obligations of Adams to Wilson and Robbins for the deferred payments and ruled that there was no evidence that the parties "mutually intended and mutually assented to an accord and satisfaction." In our opinion, the lower court correctly ruled that there was no accord and satisfaction for the reason stated by it. Mutual intention and mutual assent to an accord and satisfaction must be found to exist in order to have an effective accord and satisfaction. *Easter v. Humphrey*, 208 Md. 232, 117 A. 2d 886 (1955). See *Porter v. Berwyn Fuel & Feed Co.*, 244 Md. 629, 224 A. 2d 662 (1966), citing *Easter* with approval and following it. As the trial court found, there was no evidence indicating such mutual intention and mutual assent. It was not in error in so finding.

So far as "merger" is concerned, it is sufficient to observe that the oral contract in regard to the deferred payments did not involve partnership assets at all, but gave Wilson and Robbins, *individually*, a right to their respective deferred payments. The written contracts of May 31, 1969, dealt only with *partnership assets* and their division so that Wilson would receive his one-third share of the dissolved three-man partnership. It is correct, as Adams contends, that a written contract merges

all prior and contemporaneous negotiations in regard to the written contract which is the exclusive medium for ascertaining the extent of their obligations under the written contract, as this Court indicated in *Trotter v. Lewis,* 185 Md. 528, 533, 45 A. 2d 329, 332 (1946), upon which Adams relies; but the oral contract for the purchase by Adams of a one-third interest in the partnership was not a part of the prior or contemporaneous negotiations for the written contracts of May 31, 1969, which involved a different subject matter as we have stated. There was no "merger."

### 5.

Adams finally contends—and with effect in our opinion —that, in any event, the excess income to be paid under the oral contract was payable to Wilson and to Robbins in equal amounts, individually, as was the $20,000 payment. In short, one-half of the one-half payable was payable to Robbins individually and he could make any disposition he pleased of that interest without regard to what Wilson did with his individual interest. As we have indicated, Judge Mace found that $4,325.38 was available for application upon the deferred obligation. He further stated in his opinion that "Robbins having waived any claim to these funds, they must be applied to the obligation from Adams to Wilson. Consequently, the verdict is for the Plaintiff [Wilson] in the amount of $4,325.38 * * *." We do not agree with this conclusion. Having found that the provisions of the oral contract were substantially as testified to by Robbins and Adams in regard to the deferred payment, it is, in our opinion, logical to conclude that the deferred payments were to be made to Wilson and Robbins *individually* in equal parts on account of their respective $5,000 obligations. There is no suggestion that the respective *obligations* were to be treated differently so far as their essential nature was concerned, *i.e.,* as equal individual obligations, $10,000 to each individually to be paid for immediately and $5,000 to each individually to be liquidated by the deferred pay-

14

ment provision. The obligations were not *joint* obligations or *joint and several* obligations; they were *individual* obligations. Either Robbins or Wilson had full power to deal with his individual interest as he desired. Robbins did not intend to assign his individual interest subject to the deferred payment to Wilson. On the contrary, it is clear from Robbins' testimony that he was not demanding payment of his individual obligation from his present partner, Adams, to benefit Adams, not to benefit Wilson, his former partner. Robbins made it clear that his refusal to demand the additional payment *"from Adams"* was *his* "personal decision." It, in effect, amounted to a gift of his remaining individual interest to Adams, not to Wilson. There being $4,325.38 available *in toto* for the payment of the respective $5,000 individual obligation, the owner of each obligation was entitled to $2,162.69—or one-half of the total amount available. In our opinion, the lower court clearly erred in directing that judgment for the whole $4,325.38 be entered in favor of Wilson against Adams. Judgment should have been entered for only $2,162.69 and the judgment will be modified accordingly.

> *Judgment for $4,325.38 in favor of the appellee and against the appellant, modified by reducing it to $2,-162.69 with interest from April 21, 1971, and costs in the Circuit Court for Dorchester County; one-half the costs in this Court to be paid by the appellant and the remaining one-half of costs in this Court to be paid by the appellee.*