BORN ᴇᴛ ᴜx. *v.* STANCILLS, INC.

[No. 23, September Term, 1957.]

*Decided November 13, 1957.*

*Motion for rehearing filed December 10, 1957, denied December 16, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*H. Clifton Owens* for the appellants.

*Nelson R. Kerr* for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The purchaser, Stancills, Inc., ("Stancills") brought suit against the vendors, Louis Born and Margaret M. Born, his wife, (collectively, "the Borns") for the specific performance of a contract for the sale of a farm located in Baltimore County. The Borns demurred to the bill, their demurrer was overruled, and after they had filed an answer, the case went to trial on the merits. At the conclusion of the plaintiff's testimony, the defendants moved for a "directed verdict," which seems a curious misnomer in an equity suit.[2] The motion was denied and the defendants proceeded to offer their testimony, which evidently did not impress the Chancellor favorably. At the conclusion of the case the Circuit Court for Baltimore County entered a decree for specific performance and the appeal is from that decree.

---

**2.** The defendants below, appellants here, were not represented in the trial court by the same counsel as on this appeal. See *Phillips v. Phillips,* 215 Md. 28, 135 A. 2d 849.

Stancills is engaged in the sand and gravel business, and its interest in the Borns' farm was apparently chiefly as a source of supply of these materials. The farm is at or near Bradshaw and has a frontage of about a mile on the south side of the Pulaski highway (U. S. Route 40, which is a major east-west road between the Delaware line and the western part of Maryland). Stancills first obtained an option on the property under date of May 12, 1955. This option was to run for a period of six months, during which Stancills could (and did) make test borings or excavations on the farm for sand and gravel, at a cost of about four or five thousand dollars. If Stancills elected to exercise the option, the price was to be $140,000, payable as follows: $80,000 on or before November 12, 1955, and the balance of $60,000 in four annual instalments of $15,000 each for the next four years, with interest at 4% on successive unpaid balances.

On November 10, 1955—two days before the expiration of the option—Stancills entered into a contract with the Borns for the purchase and sale of the property. The price was the same as under the option, $140,000, of which $10,000 was paid at or before the signing of the contract, $70,000 was to be paid on January 12, 1956, and the balance of $60,000 was to be paid at the rate of $15,000 for four years with interest, payable semi-annually, at 4% on unpaid balances, accounting from November 12, 1955. The sellers were to execute and deliver a deed upon payment of the $70,000 and payment of the balance of $60,000 was to be secured by a purchase money mortgage. The purchasers had the right to prepay the balance of the purchase price and the sellers had a right of occupancy upon payment by them of maintenance charges, taxes and other public charges until the entire purchase price should be paid (or six months thereafter if fully paid before the due date), and the purchasers had the right to prepay the balance in whole or in part. The only other provisions of the contract requiring note are contained in the following sentence: "This Contract contains the final and entire Agreement between the parties hereto, and neither they nor their Agents shall be bound by any terms, conditions or representations not herein written; time being of the essence of this Agreement."

When January 12th, 1956, drew near, Stancills, acting through its president, Godfrey L. Stancill, sought a postponement of the $70,000 payment. On January 10, 1956, Mr. Stancill visited the Borns at their home and proposed paying an additional $10,000 on the purchase price, to extend the time for paying the balance of $120,000 for two months and paying interest at 5%, instead of 4%, for two months on the $120,000 balance.

Stancills claimed that it was ready, able and willing to raise the money for the $70,000 payment by January 12th, if the Borns insisted upon it. To support this contention it relies upon its comparative balance sheets and earnings, testimony of Mr. Stancill and testimony of two gentlemen employed by a company from which Stancills purchased equipment. We shall now review this evidence.

Comparative balance sheets of Stancills as of June 30, 1955 and June 30, 1956, and "comparative statements of net and retained income" for the years ending on those dates were introduced into evidence by Stancills. Each of these dates was, of course, approximately six months away from the critical date of January 12, 1956, but presumably these figures were offered for such light as they might shed upon the financial condition of Stancills in January, 1956. It is hard to see how they can aid the plaintiff corporation materially.

In the absence of direct evidence of Stancills' financial condition as of January, 1956, it seems a reasonable approximation to take the mean of the balance sheet figures submitted as of June 30, 1955 and June 30, 1956. Applying this somewhat rough and ready formula, we find that Stancills had cash of about $4,300 (as against notes payable to banks of more than $10,800) and that, in the aggregate, its current liabilities exceeded its current assets by approximately $3,900.[3]

---

3. Testimony in the record not contained in the printed record extract shows that Stancills' balances in what seems to have been its only substantial bank account on the dates stated below were as follows: November 30, 1955, $3686.00; December 30, 1955, $7017.55; January 16, 1956, $16,434.38; January 31, 1956, $6193.70. These figures are taken from a bank statement not filed as an ex-

In this connection we note that although the land to be acquired under the contract with the Borns seems to have been included on the assets side at $140,000 in the June, 1956, balance sheet, no part of the $130,000 remaining due on the purchase price shown on the liability side is carried as a current liability, though $15,000 would have been payable one year after January, 1956, if the contract of November 10, 1955 had been carried into effect.

Other figures on the balance sheets are not particularly illuminating. Advances to Stancill's Contracting Corporation (presumably an affiliated company) are shown as roughly $93,000 on June 30, 1955 and $85,000 on June 30, 1956. On the later date, about $29,400 was due by Stancills to the presumed affiliate. "Property, plant and equipment," less depreciation were carried at more than $152,000 on June 30, 1955 and at nearly $316,000 a year later. The June 30, 1956 amount appears to include the Born farm at $140,000, but there is no breakdown on the statement as between land, plant and equipment. There is testimony by Mr. Stancill that he valued the corporation's real estate at something over $200,000, and that about $14,000 remained due on the purchase price of one tract. He also valued the corporation's machinery at about $200,000, on which it owed $40,000 to $50,000. The corporation customarily bought its machinery on some instalment or financing plan, with a down payment of 20% or 25%. There is nothing to show what amount, if any, could have been borrowed by Stancills on a second mortgage on the Born farm or through a mortgage on other real estate. Inquiries along this line in the summer of 1955 were not pressed, and were apparently dropped.

Earnings figures for the fiscal year ending June 30, 1956, present no optimistic picture. Stancills had a net loss of $38,000 for that year, compared with net earnings of about $59,000 for the preceding fiscal year. The loss in fiscal 1956 was offset to the extent of a little over $10,700 by "a claim for a refund of Federal income taxes paid resulting from an

hibit, and there is nothing to show what checks may have been outstanding as of the dates mentioned.

operating loss carry back." This claim is carried as a current asset as of June 30, 1956.

It is hardly necessary to point out that the net worth of a corporation such as the appellee, as shown by its books, is far from conclusive as to its borrowing capacity.

We turn next to the testimony with regard to Stancills' banking connections. This is even less persuasive than the financial statements and earnings statements above referred to. We have already referred to cash on hand or in bank. Mr. Stancill testified that Stancills had its main account in one bank and also had accounts in two others, but no officer of any of them was produced to testify with regard to what, if any, loan his institution might have been willing to make to Stancills; nor did Mr. Stancill undertake to state how much money he could have borrowed from banks in January, 1956, or at any other time for that matter.

Lastly, with regard to Stancills' borrowing ability, we turn to the testimony of Mr. Stancill and of Messrs. Welsh and Demars of an equipment company with which Stancills did business. Mr. Stancill testified that he had discussed the matter with a Mr. Edwin W. Welsh, Executive Vice-President and Treasurer of Chesapeake Supply and Equipment Company. Mr. Welsh and a salesman employed by the same company, a Mr. Demars, valued the equipment owned by Stancills at $175,000, and Mr. Welsh testified that he had told Mr. Stancill in the summer of 1955 that he (Welsh) could procure for Stancill a loan on his equipment. Stancill wanted a loan of $100,000. The trial judge asked Mr. Welsh this direct question: "Were you willing to lend him one hundred thousand dollars after an investigation of the matter?" Mr. Welsh's reply was: "If I can explain it in this way, Sir. I could introduce him to people who would lend him, provided I signed the papers." The Record Extract does not disclose any direct question or answer as to whether or not Mr. Welsh would sign "the papers," or what "the papers" were to be. The total amount of Stancills' purchases from Mr. Welsh's company over a period of sixteen years was about $250,000, but the greatest amount of credit ever extended to Stancills at any one time was about $30,000.

. So far as we can discover, Stancills made no effort at all to obtain a loan of $70,000 at or about January 12, 1956.

Our review of the evidence relating to Stancills' ability to do so in January, 1956, leads us to these conclusions: (1) that the corporation's balance sheet and earnings statements which it offered in evidence fail to establish a borrowing capacity of $70,000 at that time; (2) that testimony with regard to its banking connections lends no support whatever to a belief that it could have obtained any such sum as $70,000 from these sources at that time; and (3) that the evidence with regard to Stancills' ability to obtain such a loan at that time through the good offices of its equipment company is insufficient to show that it could have done so. The conversations between Messrs. Stancill and Welsh were apparently some months before January, 1956, the appraisal of the machinery upon which the hoped-for loan was to be based was vague, the prospective lender was not produced, indeed was not even named or described except as a concern through which the equipment company financed its paper, and the willingness of the equipment company official to sign "the papers" which he said would have to be signed by him in order for Stancills to obtain the loan was not shown.

It seems clear that Stancills was pursuing a policy of negotiating for better terms when the time for performance came, that it was not prepared to go through with the contract on the terms therein stated, and that one reason for this was that some contracts had been held up and the receipt of expected monies therefrom had been delayed.

We feel constrained to hold that the Chancellor was not warranted in finding Stancills ready, able and willing to go through with the contract in January, 1956, and that his finding to this effect was clearly erroneous.

It is to be noted that although the plaintiff contended that the Borns agreed to a modification of the contract of November 10, 1955, it was that contract, subject to a postponement based upon waiver or estoppel, not that contract as modified by a new agreement, which the Chancellor decreed should be specifically enforced.

On the facts relating to this phase of the case, Mr. Stancill claimed that Mr. Born had agreed to an extension of time for a valuable consideration, consisting of interest at a higher rate, to which he claimed (less strongly) that Mrs. Born had also agreed. The testimony of witnesses for the plaintiff other than Mr. Stancill is somewhat inconsistent with his testimony and lends some support to the view that Mr. Born was still negotiating with Stancills up to February 7th, but had made no agreement. Mr. Stancill himself failed, we think, to show any agreement on the part of the Borns to accept a current payment of $10,000 (instead of the $70,000 called for by the contract of November 10th, 1955) and to accept a higher rate of interest (5%, instead of 4%) on the unpaid purchase price. We find, indeed, that Mr. Stancill admitted that he had never actually tendered a check in accordance with this alleged agreement and that he had not done so because "there is no point in writing out a check and fouling up your check book if something is not going through." This is quite inconsistent with his claim that Mr. Born had agreed to the proposed extension. There was also other testimony adduced by the plaintiff to the effect that Mr. Born said that he would not accept a check until the subject of real estate commissions had been settled with his brokers and that, after that was settled (no matter what the outcome might be), he would negotiate or renegotiate with Mr. Stancill.

The trial judge did not find or hold that a new and binding contract, with adequate consideration, had been entered into between the Borns and Stancills. He did find, however, that Mr. Born had agreed to an extension of time and "had, by his own words, led Mr. Stancill to believe that the contract would in fact be extended." He thus summarized his holding: "To recapitulate and put the matter in a nut shell, I believe that the tests of credibility are met by the complainant rather than the defendants. I find the time was factually not of the essence. I find that the provision as to time was waived or that the defendants are estopped to insist upon it and accordingly I will sign an appropriate decree requiring the defendants to convey the property in question to

the complainant in a manner that complies with the contract of November 10, 1955 * * *."

At the trial the court admitted evidence to show that, contrary to the express terms of the contract, time was not of the essence. In so doing the court gave an interpretation to *Rinaudo v. Bloom,* 209 Md. 1, 120 A. 2d 184, which goes far beyond the actual holding of that case, which did not abolish the parol evidence rule. An exception to that rule previously recognized in *Dinsmore v. Maag-Wahmann Co.,* 122 Md. 177, 89 A. 399, relating to proof of the actual amount remaining due at the time of the signing of a contract of sale was the major ground of the decision. (A narrow and minor ground for the holding in the *Rinaudo* case was the specific wording of the contract there involved.) The parol evidence offered to contradict the statement in the contract that time was of the essence was not admissible. *Trotter v. Lewis,* 185 Md. 528, 533, 45 A. 2d 329, and cases therein cited. The fact that the clause in question was a standard clause does not detract from the fact that the parties employed it to express their agreement.

It is a general rule that if a contract expressly declares that time is of the essence of the agreement, equity will give effect to such a provision. *Maughlin v. Perry,* 35 Md. 352; *Scarlett v. Stein,* 40 Md. 512; *Coleman v. Applegarth,* 68 Md. 21, 11 A. 284; *Phillips Roofing Co. v. Maryland Broadcasting Co.,* 184 Md. 187, 40 A. 2d 298 (rule recognized but found inapplicable); *Triton Realty Co. v. Frieman,* 210 Md. 252, 123 A. 2d 290.

Since the decision of the trial court was not rested upon an alleged parol modification of a contract required by the Statute of Frauds to be in writing, we need spend little time in disposing of any claim that such a contract could be modified by a subsequent oral agreement. See *Abrams v. Eckenrode,* 136 Md. 244, 110 A. 468; *Markoff v. Kreiner,* 180 Md. 150, 23 A. 2d 19; *Bank v. Hurst Estate,* 187 Md. 333, 50 A. 2d 133; *Garbis v. Weistock,* 187 Md. 549, 51 A. 2d 154. Cf. *Soehnlein v. Pumphrey,* 183 Md. 334, 37 A. 2d 843.

There is likewise no need to consider any contention that the recorded testimony of either of the defendants supplies the

requisite memorandum of an agreement modifying the written contract of sale of November 10, 1955, to satisfy the Statute of Frauds, as in *Trossbach v. Trossbach,* 185 Md. 47, 42 A. 2d 905, or in *Sealock v. Hackley,* 186 Md. 49, 45 A. 2d 744, for the reason that there is no testimony from the defendants that they agreed to any modification of the contract involving a valuable consideration. The most that can be deduced from Mr. Born's testimony in this regard is that between January 12 and February 7, 1956, (the date of his last conference with Mr. Stancill and of his counsel's letter notifying Stancills of a default and stating that the Borns considered the contract null and void) is that up to that date he considered himself bound to go through with the contract of November 10, 1955, if Stancills had then put up the $70,000. We find the evidence offered by the plaintiff as to why no check was tendered and other evidence of similar import above referred to convincing as showing that no agreement had actually been made between Stancills and the Borns for an extension of time for a valuable consideration. An extension agreement not supported by such consideration, even if made, would not be an enforceable contract. *Coleman v. Applegarth, supra,* 68 Md. 21, at 29.

The plaintiff's case is then reduced to a matter of estoppel. Its brief speaks of waiver or estoppel; but it seems to use waiver as meaning estoppel, and the latter is the ground relied upon.

It is perfectly true that a party may be estopped by some action on his part from insisting upon enforcement of an agreement as to the time for performance of a contract. *Phillips Roofing Co. v. Maryland Broadcasting Co.* and *Triton Realty Co. v. Frieman,* both cited above. See also *Chapman v. Thomas,* 211 Md. 102, 126 A. 2d 579.

To make what is already a long story no longer than necessary, we think that the Chancellor was clearly in error in finding that the Borns had agreed to an extension, with or without consideration therefor. Accordingly, the very foundation of an estoppel seems to us to be lacking.

Even if an oral promise to grant an extension had been made, we think, as we have already stated, that Stancills has

454

failed to show that it was ready, able and willing to perform its obligations under the contract of November 10th, 1955, either when it sought an extension on or about January 9th, 1956, or at the time of Mr. Stancill's interview with Mr. Born on February 7th, 1956. Such a showing is essential to the right of a party seeking specific performance to obtain a decree therefor. *Raith v. Cohen,* 142 Md. 38, 119 A. 700; *Sealock v. Hackley,* 186 Md. 49, 45 A. 2d 744; *Chapman v. Thomas, supra,* 211 Md. 102, at 108.

We find it unnecessary to consider the questions raised by the appellants as to whether or not their demurrer was properly overruled and as to the sufficiency of the evidence to bind Mrs. Born as well as Mr. Born by the asserted extension agreement.

For the reasons set forth above we think that the bill should have been dismissed.

> *Decree reversed and bill of complaint dismissed, costs to be paid by the appellee.*